# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NEIL FREEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0615-PAF |
| | ) | |
| MICHAEL QUALIZZA, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| URBAN DEVELOPMENT FUND, LLC, | ) | |
| a Delaware limited liability company, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 19, 2022
Date Decided: August 12, 2022

James D. Taylor, Jr., Aubrey J. Morin, SAUL EWING ARNSTEIN & LEHR LLP, Wilmington, Delaware; Gregory J. Scandaglia, William J. Ryan, Joseph R. Swee, SCANDAGLIA RYAN LLP, Chicago, Illinois; *Attorneys for Plaintiff Neil Freeman.*

Douglas D. Herrmann, Emily L. Wheatley, TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware; Mark H. Horwitch, Daniel L. Stanner, TABET DIVITO & ROTHSTEIN LLC, Chicago, Illinois; *Attorneys for Defendant Michael Qualizza.*

**FIORAVANTI, Vice Chancellor**

This case presents a dispute under Section 18-110 of the Delaware Limited Liability Company Act (the "LLC Act") to determine the manager of Urban Development Fund, LLC ("UDF" or the "Company"), a Delaware limited liability company. Plaintiff Neil Freeman seeks an order confirming that Aries Capital, LLC, acting as manager of Aries Community Capital, LLC, validly removed and replaced Defendant Michael Qualizza as UDF's manager through the execution of written consents in July and October of 2021. In this post-trial Memorandum Opinion, the court concludes that both consents were valid. Therefore, the court will enter an order declaring that Qualizza was removed as manager of UDF on July 14, 2021 and Freeman was appointed as manager of UDF on that same date.

## I. BACKGROUND

These are the facts as the court finds them after trial, which was held on a paper record.[1]

---

[1] Documents filed on the docket for this case are cited as "Dkt." followed by their docket number. The trial transcript (Dkt. 93) is cited as "Tr."; deposition testimony is cited as "[Name] Dep."; trial exhibits are cited as "JX"; and stipulated facts in the pretrial order (Dkt. 94) are cited as "PTO," with each followed by the relevant page, paragraph, or exhibit number. The parties raised evidentiary objections to a handful of exhibits, which they identified on the joint exhibit list. Dkt. 84 (Joint Exhibit List). At the conclusion of the trial, the court invited the parties to submit supplemental memoranda on their evidentiary objections. As to the exhibits cited in this opinion to which objections were raised, the objections are overruled. Briefly stated: (1) Plaintiff was not unduly prejudiced by the timing of Defendant's identification of JX 96; (2) Defendant's hearsay and relevance objections to JX 106 are denied. The documents are not offered for their truth, and they

## A. The Parties and the Relevant Entities

Nominal Defendant UDF is a Delaware limited liability company organized in 2002.[2] UDF is a certified Community Development Entity ("CDE") that provides financing for eligible development projects in low-income communities.[3] Through its participation in the U.S. Department of the Treasury's New Markets Tax Credits ("NMTC") Program, UDF obtains tax credits which it then uses to provide favorable financing for projects in underserved communities.[4]

UDF's co-founders are Plaintiff Neil Freeman, Defendant Michael Qualizza, and non-party Edward James Keledjian.[5] Each of the co-founders brought different professional talents to the project. Qualizza is experienced in tax credit investments and originally proposed the idea of starting a CDE.[6] Keledjian is a real estate

---

are relevant to the background of this dispute; (3) Defendant's relevance and privilege objections to JX 108, JX 112 and JX 117 are denied. The documents are relevant to the background of this dispute. Defendant's privilege objections indicated that a portion of these emails need redaction, but the Defendant never identified which portions required redaction. Nor did he pursue the privilege objections in his post-trial submission. Finally, the specific communications from these email strings that are cited in the opinion are not privileged.

[2] PTO, III ¶ 1.

[3] *Id.* ¶¶ 3–4.

[4] *Id.* ¶ 4.

[5] PTO, III ¶¶ 20(a), 21(a), 22(a).

[6] Dkt. 82, Ex. A ("Qualizza Aff.") ¶ 4; Dkt. 80 ("Keledjian Aff.") ¶ 7.

investor, and it was his idea to include Freeman.[7]  Freeman has a background in financing commercial real estate developments and boasts relationships with several institutional lenders.[8]  Together, these three individuals formed UDF in 2002 and designated Qualizza as its manager.[9]

Since its founding, UDF has had two members.[10]  Aries Community Capital, LLC ("ACC") owns 99.99% of the member interests in UDF, and Qualizza controls the remaining 0.01%.[11]  ACC has three members:  Freeman, Qualizza, and Keledjian.[12]  ACC was originally formed as an Illinois limited liability company.[13]  In February 2016, ACC's members converted it to a Texas limited liability company.[14]  ACC's membership interests are presently divided as follows:

(1) Freeman, through Aries Capital, LLC ("Aries Capital"):  46%

(2) Qualizza, through QSG Holding Co., LLC ("QSG" or "QG"):  46%

---

[7] Qualizza Aff. ¶¶ 5–7; Keledjian Aff. ¶¶ 2–4, 6–7.

[8] Qualizza Aff. ¶ 6; Keledjian Aff. ¶ 12; Dkt. 80 ("Freeman Aff.") ¶¶ 55–56.

[9] PTO, III ¶¶ 13, 19–22.

[10] *Id*. ¶ 6.

[11] *Id*. ¶¶ 8–9; UDF Operating Agreement at NF004803.

[12] JX 5 (2004 ACC Operating Agreement); PTO, III ¶ 19–22.

[13] 2004 ACC Operating Agreement at NF004689.

[14] PTO, III ¶ 7; JX 78.

(3) Keledjian, through Associated Equities, Inc. ("Associated Equities"): 8%.[15]

ACC's sole material asset is its interest in UDF.[16] In 2004, ACC's members executed the Operating Agreement of Aries Community Capital, LLC (the "ACC Operating Agreement") which designated Aries Capital as ACC's manager.[17] Aries Capital, which Freeman controls and holds the position of President and Chairman, has served as ACC's manager since ACC's formation.[18]

UDF operates with an advisory committee (the "Advisory Board") that provides guidance "regarding the development and implementation of the Company's strategy for development of low income communities and will also provide advice about the near and long term-planning of the Company's business."[19] During the relevant time period, the Advisory Board consisted of five members.[20]

---

[15] JX 25 (ACC Operating Agreement) (effective May 1, 2007).

[16] Freeman Aff. ¶¶ 7, 319; Qualizza Dep. 205:7–11; *see also* Dkt. 82 ("Def.'s Pretrial Br.") 6 (referring to UDF as ACC's "sole asset"), 14 (same), 22 (same), 37 (referring to UDF as ACC's "only asset"), 39 (same).

[17] 2004 ACC Operating Agreement § 7.2.

[18] PTO, III ¶ 24; Freeman Aff. ¶ 3.

[19] JX 3 (UDF Operating Agreement) § 4.16(d).

[20] *See* JX 164.

## B. Events Leading to Qualizza's Removal

Freeman and Qualizza's business relationship spans at least two decades and extends beyond UDF and ACC. Since co-founding UDF, Qualizza and Freeman have invested together in various real estate developments unrelated to UDF.[21] Around March 2021, Qualizza became concerned about Freeman's handling of these investments.[22] Qualizza believed that he was receiving insufficient reporting for at least one project and suspected that his investments were being applied to additional projects without his consent.[23]

In April 2021, Qualizza notified Freeman and UDF's Chief Financial Officer, Chad Goodall, of Qualizza's desire "to retire from UDF."[24] In April, Qualizza also began to challenge Aries Capital's entitlement to certain UDF distributions.[25] That led Qualizza to withhold UDF information from ACC, Aries Capital, and Freeman.[26]

---

[21] Freeman Aff. ¶¶ 21, 56; Qualizza Aff. ¶ 26.

[22] JX 96.

[23] *Id.*; Def.'s Pretrial Br. 9.

[24] JX 99 at NF004072; Goodall Dep. 17:1–7.

[25] JX 103 at NF006060 ("I will not approve any further distributions until I understand what Aries Capital is doing to get 46% and Associated Equites at 8%.").

[26] Freeman Aff. ¶ 196.

Around this same time period, Qualizza engaged in some contentious email exchanges with entities that did business with Freeman and Qualizza.[27] In one email exchange, the recipient replied to Qualizza that he would "not be responding."[28] Recipients of some of those emails contacted Freeman for help.[29] When Freeman intervened, Qualizza turned his anger to his business partner, accusing Freeman of "cheating" and breaching his fiduciary duties.[30] In that same April 21, 2021 email to Freeman, Qualizza wrote: "Our partnership is over."[31]

---

[27] *See*, *e.g.*, JX 94 at NF004175 (threatening litigation against hotel management company); JX 97 at NF003540 (threatening to file report with the FBI regarding hotel franchisor); JX 112 at NF003728 (threatening to report to the FBI and institute litigation against hotel management company); JX 114 at NF004103 (threatening litigation); JX 118 at NF004098 (threatening "[d]epositions and [d]iscovery"); JX 119 at NF004123 (same); JX 120 at NF004122 (accusing hotel management company of "[f]ederal [c]rimes"); JX 121 at NF004128 (threatening litigation and "[f]ire and brimstone" against hotel management company); JX 122 at NF004133–34 (accusing hotel management company of committing federal crimes) ; JX 123 at NF004134 (accusing hotel management company of extortion); JX 125 at NF004121 (same) .

[28] JX 110 at NF003679.

[29] *See* JX 106 at NF03656 (email to Freeman, stating: "[Qualizza] is becoming unhinged").

[30] JX 112 at NF003716; *see also* JX 108 at NF003515 (accusing Freeman of "[d]efamation, breach of contract, fraud, interference"); JX 117 ("You . . . Misrepresenting liar . . . I see an orange jumpsuit in your future."); JX 124 at NF004130 (accusing Freeman of committing federal crimes); JX 126 at NF004143 ("I am Coming for you."); JX 128 at NF004148 ("You going to have a number not a name when I am done with you . . ."); JX 129 a NF004140 (calling Freeman a "thief"); JX 138 at NF003784 ("Hope you look good in Orange.  You are a walking sloop fest of fiduciary breaches and felony behavior.").

[31] JX 112 at NF003716.

6

On May 24, 2021, Freeman and Keledjian called for a Special Meeting of the UDF Advisory Board to "[d]iscuss and review recent conduct of [Qualizza] detrimental to the operation and reputation of UDF . . . including but not limited to: a. violent threats made by Qualizza against [Freeman]; b. threats and insults damaging to operations and reputation by Qualizza to . . . other individual and entities."[32] Consistent with Qualizza's email indicating the end of their professional relationship, Freeman informed the UDF Advisory Board "I am required to inform the Board that Michael Qualizza and I must separate and get a business divorce."[33]

The UDF Advisory Board met on June 7, 2021,[34] but took no action.[35] The day after the meeting, Qualizza sent Freeman a mocking email, accusing him of fraud, and stating, in part: "How did your meeting go . . . LOL . . . You are doomed! . . . Fat usually sinks to the bottom. Great job loser, your lawyer is a bigger loser than you."[36]

---

[32] JX 133; JX 134.

[33] JX 134 at NF006582; *see* Freeman Dep. 114.

[34] JX 138.

[35] Freeman Aff. ¶ 209.

[36] JX 138.

### C. Freeman Moves to Remove Qualizza as Manager of UDF and Files this Action

On July 14, 2021, Freeman, in his capacity as Chairman of Aries Capital, executed a written consent of Aries Capital, in its capacity as manager of ACC, providing for the immediate removal of Qualizza as UDF's manager and the appointment of Freeman as his replacement (the "July Consent").[37] Copies of the July Consent were delivered to UDF (via personal service and USPS registered mail) and to Qualizza (via email and FedEx).[38]

The next day, Freeman initiated this action under 6 *Del. C.* § 18-110 to confirm Qualizza's removal as UDF's manager and Freeman's appointment as the new UDF manager.[39] In conjunction with his complaint, Freeman filed motions to expedite these proceedings and for a status quo order designating Freeman as manager of UDF pending a final adjudication on the merits.[40]

Qualizza opposed the motions.[41] Among other things, Qualizza argued that the July Consent was ineffective.[42] Specifically, Qualizza argued that under Section

---

[37] JX 146.

[38] JX 148, JX 149.

[39] Dkt. 1.

[40] *Id.*

[41] Dkt. 8 (Def.'s Opposition to Mot. to Expedite).

[42] *Id.* ¶ 3.

8

7.1(i) of the ACC Operating Agreement, Aries Capital can act unilaterally only as to "daily operations of the Company not reasonably inconsistent with [the ACC Operating] Agreement."[43] Qualizza contended that removal of UDF's manager was not part of ACC's "daily operations."[44] Instead, Qualizza indicated that his removal needed to comply with Section 7.1(iii), which permits Aries Capital to perform "other duties . . . as may be authorized by resolution of, or otherwise in writing by, Majority Consent."[45] Qualizza noted that Freeman controlled only 46% of the membership interests of ACC and, therefore, did not satisfy Section 7.1(iii).[46] Qualizza also argued for a stay of this action in favor of an arbitration proceeding that he had recently commenced in Illinois.[47]

On July 26, 2021, the court held oral argument on the motions to expedite and for a status quo order.[48] The court rejected Qualizza's argument for a stay in favor of the Illinois arbitration, because the relief sought in the arbitration was prospective and did not seek any determination as to the validity of Qualizza's removal as UDF's

[43] *Id.* ¶¶ 13, 16.

[44] *Id.* ¶ 16 ("Aries Capital does not have the authority under the ACC Operating Agreement to cause ACC to vote to remove Qualizza as manager of UDF as such action is outside of ACC's 'daily operations' . . .").

[45] *Id.* ¶¶ 13, 15–16.

[46] *Id.* ¶ 3.

[47] *Id.* ¶ 1; *see also id.* ¶ 21.

[48] Dkt. 17.

manager.[49]  The court granted the motion to expedite, entered a status quo order keeping Qualizza in place as the manager of UDF, and directed the parties to confer on a schedule and hearing date.[50]

On October 8, 2021, three months after the filing of the original complaint, Freeman and Keledjian executed a written consent on behalf of their respective entities holding 54% of the membership interests of ACC, confirming and approving the July Consent and authorizing and directing Aries Capital to remove Qualizza as UDF's manager and to replace him with Freeman (the "October Member Consent").[51]  Notice of the October Member Consent was then delivered to ACC and QG via FedEx on October 12, 2021.[52]  That same day, Aries Capital, as Manager of ACC, executed a second written consent removing and replacing Qualizza as manager of UDF ("the October Manager Consent").[53]  Copies of the October Manager Consent were then delivered to UDF (via USPS registered mail) and to Qualizza (via email and FedEx).[54]  The October Member Consent and October Manager Consent are collectively referred to as the "October Consents."

---

[49] Dkt. 23 at 37.

[50] Dkt. 16.

[51] JX 172.

[52] JX 174, JX 177.

[53] JX 173.

[54] JX 175, JX 176.

Despite the court's July 2021 expedition order, which contemplated a final merits hearing within approximately 60 days,[55] the parties did not submit a scheduling order and did not proceed toward a hearing date within that time frame. Indeed, the first discovery request of either party was not served until mid-November.[56] In late November 2021, the parties requested a final hearing date in January 2022. On November 29, 2021, the court offered, and the parties accepted, a February 2, 2022 hearing date, but they did not follow up with a scheduling order.[57]

On December 6, 2021, Freeman filed an amended complaint to include, as an independent basis for relief, the October Consents.[58] Three weeks later, Freeman filed a motion on December 29, 2021, seeking to adjourn the February 2, 2022 hearing date, claiming an inability to be ready for trial.[59] In a bit of irony, after having previously argued that the parties' dispute should not proceed in this court, Qualizza opposed the motion to adjourn the trial date, citing a risk of harm to UDF's business and future as a result of additional delay in the adjudication of this matter.[60]

---

[55] Dkt. 15.

[56] Dkt. 29.

[57] Dkt. 31.

[58] Dkt. 32.

[59] Dkt. 42.

[60] Dkt. 44; *see also* Dkt. 67 (Jan. 5, 2022 Hrg. Tr. at 16) (Defendant's counsel: "[W]e're asking for the court to hold [Plaintiff] to that expedited schedule and have this matter heard on February 2nd so that it can get resolved.").

After reviewing the parties' positions, and noting a general lack of diligence from both parties in moving the case forward, the court vacated the prior order granting expedited proceedings, removed the February 2, 2022 hearing date from the court's calendar, and vacated the status quo order.[61] The court directed the parties to submit a proposed scheduling order by January 12, 2022, indicating when they would be ready to try the case.[62]

On January 12, 2022, the parties submitted a stipulated proposed scheduling order providing for a half-day trial on a paper record.[63] The proposed order indicated the parties would be ready to try the case after April 6, 2022.[64] On January 26, 2022, the court entered the case scheduling order, setting a trial date of May 2, 2022.[65] On February 9, 2022, the parties submitted, and the court entered, a new, stipulated form of status quo order, providing for Qualizza to serve as UDF's manager pending resolution of this litigation.[66]

Lurking in the background of this case are Qualizza's legal proceedings in Illinois. In October 2021, Qualizza filed an action in Illinois state court, largely

---

[61] Dkt. 52.

[62] *Id.* at 3.

[63] Dkt. 55.

[64] *Id.*

[65] Dkt. 60.

[66] Dkt. 68 & 69.

reasserting the claims he had asserted in his prior arbitration proceeding.[67] In early April 2022—with trial in this case fast approaching—Qualizza filed an amended complaint in the Illinois action, asserting claims that are at issue in this case.[68]

Qualizza's April 19, 2022 pretrial brief argued that this court lacks jurisdiction to hear this case because the ACC Operating Agreement designates the state and federal courts in Cook County, Illinois as the exclusive venue for "any suit, action or proceeding with respect to [the ACC Operating] Agreement."[69] Qualizza's assertion was surprising, because in the nine months since the filing of this action, he had not filed any motion challenging venue or jurisdiction in this court. Qualizza's new argument was particularly jarring in light of his recent opposition to Freeman's motion to adjourn the trial, in which Qualizza argued that further delay in resolving this case would cause harm to UDF.[70]

On April 27, 2022, the court held a telephonic hearing and requested supplemental briefing on the jurisdiction and venue issues that Qualizza raised in his

---

[67] *QG Hldg. Co. v. Aries Cap., et al*, Case No. 2021-CH-05272 (Ill. Cir. Ct.).

[68] *Id.*

[69] Def.'s Pretrial Br. 20–21; ACC Operating Agreement § 16.11.

[70] *See* Dkt. 44 at 1 ("Adjournment of this case from the February 2, 2022 hearing date would be highly prejudicial to [UDF]"); Dkt. 67 (Jan. 5, 2022 Hrg. Tr. at 15) ("this delay is hurting the company").

pretrial brief.[71]  The parties made supplemental pretrial filings,[72] and in a bench

ruling at the start of trial on May 5, 2022, the court held that Qualizza had waived

any right to assert that this court lacks jurisdiction or is an improper venue.[73]  Among

other reasons, the court cited Qualizza's answers to the original complaint and the

amended complaint, in which he unequivocally admitted that this court has

jurisdiction over and is the proper venue for this action.[74]

Immediately following the denial of Qualizza's jurisdiction and venue

arguments, the court held a half-day trial on May 5, 2022.  The trial was conducted

on a paper record, with approximately 220 exhibits, and deposition testimony from

six witnesses, including Freeman and Qualizza.[75]  The parties later filed post-trial

submissions.[76]

## II.   ANALYSIS

Section 18-110 the LLC Act governs this dispute.  It provides, in pertinent

part:

---

[71] Dkt. 87.

[72] Dkt. 88; Dkt. 89.

[73] Tr. 5–12.

[74] Dkt. 24 ("Def's Answer to Compl.") ¶¶ 10–11; Dkt. 39 ("Def.'s Answer to Am. Compl.") ¶¶ 18–19.

[75] Joint Exhibit List; Dkt. 94.

[76] Dkt. 96; Dkt. 97.

14

> [T]he Court of Chancery may hear and determine the validity of any . . . election, appointment, removal or resignation of a manager of a limited liability company . . . and to that end make such order or decree in any such case as may be just and proper . . . .

6 *Del. C.* § 18-110(a).  A proceeding under this statute "is summary in character, and its scope is limited to determining those issues that pertain to the validity of action to elect or remove a manager."  *Lynch v. Gonzalez*, 2020 WL 3422399, at \*5 (Del. Ch. June 22, 2020).  "A Section 18-110 proceeding is 'designed to focus with precision on the corporate interest in prompt resolution of grievances respecting claims to office.'"  *Id.* (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.09[b], at 9–20 (2nd ed. 2018)); *see also Zohar III Ltd. v. Stila Styles, LLC*, 2022 WL 1744003, at \*7 (Del. Ch. May 31, 2022) (noting "this court's preference" that "the parties br[ing] their summary dispute [under Section 18-110] directly to trial without . . . pleading stage or summary judgment motion practice").

## A.      Aries Capital Validly Removed and Replaced UDF's Manager

Whether Qualizza was removed as manager of UDF turns on the validity of the July Consent and, alternatively, the October Consents.  The validity of those consents turns on whether they were executed in accordance with the terms of the UDF and ACC Operating Agreements.

15

### 1. The UDF Operating Agreement

The UDF Operating Agreement is governed by Delaware law.[77] It states that a "Manager shall hold office . . . until resignation or removal by the Members."[78] The manager "may be removed or replaced with or without cause by a vote of a Majority in Interest of the Members entitled to vote thereon."[79]

"Majority In Interest of the Members" is defined as "the Members whose aggregate share of the current Profits of the Company constitutes more than one-half of the aggregate of such shares of all Members."[80] As the holder of a 99.99% interest

---

[77] UDF Operating Agreement § 9.4.

[78] *Id.* § 4.6.

[79] *Id.* § 4.7. The parties spill much ink over the "cause" for Qualizza's removal. Freeman alleges that Qualizza's conduct in the first half of 2021 jeopardized UDF's relationships with its business partners and damaged its reputation in the CDE community. Dkt. 88 ("Pl.'s Pretrial Br.") 21. Plaintiff submits various communications sent from Qualizza, involving Qualizza, or discussing Qualizza, in support of this claim. *See, e.g.*, JX 93–95, JX 98–101, JX 103, JX 105, JX 107–09, JX 111–118, JX 132, JX 136, JX 143–44, JX 207. Through pretrial and post-trial submissions, Defendant objects to the admission of many of these exhibits on the basis of relevance, hearsay, and/or privilege. Joint Exhibit List; Dkt. 96 at 8–10. As the court noted at the close of trial, this case presents a straightforward contractual dispute. Tr. 67. The UDF operating agreement provides the same procedure for the removal of its manager with or without cause. UDF Operating Agreement § 4.7. This means a finding of cause, or lack thereof, is immaterial to the validity of the July Consent and the October Consents.

[80] UDF Operating Agreement § 1.1.

in UDF, ACC has at all relevant times constituted a "Majority in Interests of [UDF's] Members." The parties do not dispute this fact.[81]

Any action required or permitted to be taken by vote under the UDF Operating Agreement "may be taken without a meeting, without prior notice and without a vote" if consented to in writing by the requisite voting interest.[82] Therefore, under the UDF Operating Agreement, ACC has the power to remove or replace UDF's manager with or without cause, and without prior notice, by written consent.

Compliance with the UDF Operating Agreement is not the focus of dispute in this case. Instead, Qualizza challenges the validity of the July Consent and the October Consents under the terms of the ACC Operating Agreement. The resolution of those issues requires the construction and interpretation of the ACC Operating Agreement.

### 2.    The ACC Operating Agreement

The ACC Operating Agreement is governed by Illinois law.[83] Under the law of Illinois, as in Delaware, "[t]he primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007)

---

[81] Pl.'s Pretrial Br. 31; Def.'s Answer to Compl. ¶¶ 31–33; Def.'s Answer to Am. Compl. ¶¶ 39–41.

[82] UDF Operating Agreement § 3.7 Action Without a Meeting.

[83] ACC Operating Agreement § 16.6.

(collecting cases). When the contract's terms are clear and unambiguous, the parties' intent must be determined solely from the plain and ordinary meaning of the express language of the contract. *ESP Global, LLC v. Nw. Cmty. Hosp.*, 158 N.E.3d 721, 725 (Ill. App. Ct. 2020). The court's deference to the contractual language is heightened where, as here,[84] the contract contains an integration clause:

> When parties sign a memorandum expressing all the terms essential to a complete agreement, they are to be protected against the doubtful veracity of the interested witnesses and the uncertain memory of disinterested witnesses concerning the terms of their agreement, and the only way in which they can be so protected is by holding each of them conclusively bound by the terms of the agreement as expressed in the writing. All conversations and parol agreements between the parties prior to the written agreement are so merged therein that they cannot be given in evidence for the purpose of changing the contract or showing an intention or understanding different from that expressed in the written agreement.

*Armstrong Paint & Varnish Works v. Cont. Can Co.*, 133 N.E. 711, 713 (Ill. 1921). Therefore, absent a finding of ambiguity, this court is precluded from going beyond the "four corners" of the contract to consider extraneous evidence of the parties' prior dealings. *Air Safety, Inc. v. Tchrs. Realty Corp.*, 706 N.E.2d 882, 885 (Ill. 1999).

Illinois follows the general rule that a contract is not ambiguous merely because the parties disagree as to its meaning. *Paris-Custardo v. Great Am. Ins. Co.*

---

[84] ACC Operating Agreement § 16.1 ("This Agreement represents the entire agreement among all the Members and between the Members and the Company.").

*of N.Y.*, 844 N.E.2d 1011, 1014 (Ill. App. Ct. 2006). Rather, "[a] contract is properly found ambiguous when the language used is susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression." *Meyer v. Marilyn Miglin, Inc.*, 652 N.E.2d 1233, 1238 (Ill. App. Ct. 1995) (internal citation omitted).[85]

ACC's sole manager is Aries Capital. Freeman controls Aries Capital and serves as its President and Chairman. Section 7.1 of the ACC Operating Agreement defines the scope of Aries Capital's managerial authority:

> The Manager shall (i) be responsible for all daily operations of the Company not reasonably inconsistent with this Agreement; (ii) attend meetings of the Members; and (iii) undertake such other duties and serve on such other terms and conditions as may be authorized by resolution of, or otherwise in writing by, Majority Consent.[86]

Aries Capital cites to Section 7.1(i) and 7.1(iii) as the sources of its authority for the July Consent and October Consents, respectively. The court considers them in turn.

### a. Section 7.1(i) Authorized the July Consent

The ACC Operating Agreement provides that Aries Capital, as manager of ACC, shall "be responsible for all daily operations of [ACC] not reasonably inconsistent with this Agreement."[87] The agreement does not define "daily

---

[85] Defendant's pretrial brief does not provide the court with any Illinois case law governing this contractual analysis.

[86] ACC Operating Agreement § 7.1.

[87] *Id.* § 7.1(i).

operations." Plaintiff concedes, and Defendant agrees, that the term "daily operations" "does not have an unambiguous meaning on its face."[88]

"Whether language of an agreement is ambiguous and requires additional evidence for interpretation is a question of law." *River's Edge Homeowners' Ass'n v. City of Naperville*, 819 N.E.2d 806, 809 (Ill. App. Ct. 2004). "[A]s the appellate court [of Illinois] has so often stated, an ambiguity will be found if the language of the contract is 'obscure in meaning through indefiniteness of expression.'" *Cent. Il. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004) (quoting *Platt v. Gateway Int'l Motorsports Corp.*, 813 N.E.2d 279, 330 (Ill. App. Ct. 2004)).

This court agrees with the parties and finds that the meaning of the undefined term "daily operations" is facially ambiguous. As a result of this determination, the court may consider extrinsic evidence to determine the term's meaning. *Gillespie Cmty. Unit Sch. Dist. No. 7, Macoupin Cty. v. Union Pac. R. Co.*, 43 N.E.3d 1155, 1173 (Ill. App. Ct. 2015).

Qualizza testified that ACC's only day-to-day business operations were as serving as a conduit for Aries Capital's control over UDF:

Q. . . . What is the role of Aries Community Capital in UDF's business?

A. They play the role of the -- they're the fee-receiving entity and they play the real role of essentially the conduit for the controlling entity.

---

[88] Pl.'s Pretrial Br. 48; Tr. 98.

And Aries Community Capital is set up so that we can have a partnership that worked without having to somehow become members of Aries Capital.[89]

Qualizza conceded that ACC does not have any other assets,[90] and its only business operations have been as the conduit for control of UDF.[91] Qualizza, acting on behalf of UDF, designated Aries Capital as UDF's controlling entity on every application submitted for New Market Tax Credit Allocations (the crux of its very business model).[92] In addition, Aries Capital, as manager of ACC, has authority to act on ACC's behalf.[93]

The evidentiary record establishes that ACC's daily operations, as stated in Section 7.1(i) of the ACC Operating Agreement, consisted of controlling UDF. ACC was the vehicle that Freeman, Qualizza, and Keledjian created to control UDF. By designating Aries Capital as ACC's manager, the members vested Aries Capital with control over ACC's sole asset—UDF. Because ACC's only asset was UDF, the daily operations of ACC necessarily included exercise of control over the asset.

---

[89] Qualizza Dep. 204:9–16.

[90] *Id.* at 205:7–11 ("Q. And Aries Community Capital doesn't have any other assets, right? Other than its membership interest in UDF; is that true? A. Yeah. I need to say that that's a failure of the people who managed Aries Community Capital.").

[91] *Id.* at 205:21–207:1.

[92] Qualizza Dep. 177:21–178:2, 182:22–183:22; *see also* JX 6; JX 12; JX 13; JX 19; JX 22; JX 32; JX 41; JX 43; JX 49; JX 211; JX 212.

[93] *See* JX 26 (appointing Freeman and Qualizza as officers of ACC); *see also* JX 34 (manager resolutions).

Under the UDF and ACC Operating Agreements, ACC could not exercise that control directly through the day-to-day operation of UDF. Instead, the ACC Operating Agreement gave ACC the power to do so indirectly, through its ability to determine UDF's manager. Therefore, ACC's managerial authority over the daily operations of ACC necessarily included the authority to appoint, remove, and replace UDF's manager.

Freeman executed the July Consent, pursuant to Section 7.1(i) of the ACC Operating Agreement.[94] The court finds that the July Consent was the product of a valid exercise of Aries Capital's managerial authority over the daily operations of ACC under Section 7.1(i) of the ACC Operating Agreement. Therefore, as of July 14, 2021, the date of the July Consent, Qualizza was removed as manager of UDF and replaced as manager by Freeman.

The court could end the analysis here, but for the sake of completeness, the remainder of this opinion addresses the validity of the October Consents.

### b. The October Consents Validly Removed Qualizza and Appointed Freeman as UDF's Manager

In addition to Aries Capital's managerial responsibility for the daily operations of ACC under Section 7.1(i) of the ACC Operating Agreement, Aries

---

[94] To be precise, Freeman executed the July Consent as chairman of Aries Capital Holdings, as manager of Aries Capital, as Manager of ACC. JX 146 at NF000637.

Capital is also required, under Section 7.1(iii), to "undertake such other duties . . . as may be authorized by resolution of, or otherwise in writing by, Majority Consent."[95] Qualizza argues that Section 7.1(iii) is ambiguous because the term "Majority Consent" is not defined in the Operating Agreement. He is wrong.

The mere fact that a contract term is undefined does not render it ambiguous. "[I]f an undefined term has a 'plain, ordinary, and popular meaning,' there is no ambiguity and the term should be enforced as written." *Hunt v. Farmers Ins. Exch.*, 831 N.E.2d 1100, 1102 (Ill. App. Ct. 2005) (quoting *Chatham Corp. v. Dann Ins.*, 812 N.E.2d 483, 488 (Ill. App. Ct. 2004)). The plain meaning of majority consent is not ambiguous.

"A dictionary is a good place in which to find the plain and ordinary meaning of words." *Gillespie*, 43 N.E.3d at 1174. *Black's Law Dictionary* defines "majority" as "[a] number that is more than half of a total." Majority, *Black's Law Dictionary* (11th ed. 2019). The Supreme Court of Illinois has previously applied the same definition. *Lipinski v. Chicago Bd. of Election Comm'rs*, 500 N.E.2d 39, 43 (Ill. 1986) (noting that "majority is 'a number greater than half of a total'") (quoting *Webster's Third New International Dictionary* 1363 (1971)). The meaning of Majority is clear and unambiguous. Under the plain meaning of Section 7.1(iii) of

---

[95] ACC Operating Agreement § 7.1(iii).

the ACC Operating Agreement, Aries Capital is required to undertake such duties authorized by the consent of more than half of the total membership interests of ACC.

On October 8, 2021, Keledjian, as president of Associated Equities, Inc., and Freeman, as chairman of Aries Capital Holdings, in turn, as manager of Aries Capital, executed the October Member Consent "consent[ing] to, confirm[ing], and approv[ing]" the removal of Qualizza as manager of UDF and the designation of Freeman as his replacement.[96] Aries Capital and Associated Equities together own 54% of ACC's membership interests.[97] Qualizza does not challenge this fact.[98] On October 12, 2021, Aries Capital executed the October Manager Consent effectuating Qualizza's removal and Freeman's appointment as UDF's manager in accordance with the October Member Consent.[99]

Under the plain language of Section 7.1(iii), and applying the unambiguous and ordinary meaning of Majority, the manager of ACC was authorized to carry out the duties identified in the written consent of more than 50% of the ACC

---

[96] JX 172.

[97] PTO, III ¶¶ 22(b) ("From May 1, 2007 through the present, [Associated Equities] has held 8% of the membership interests of ACC."), 20(e) ("From May 1, 2007 through the present, Aries Capital has held 46% of the membership interests of ACC").

[98] *Id.*; *see also* Def.'s Answer to Compl. ¶ 94 ("Defendant admits that the collective share of Aries Capital and Associated Equities in ACC is equal to 54%.").

[99] JX 173.

membership interests.[100]  Aries Capital and Associated Equities together constitute 54% of ACC's member interests, representing a majority of the membership interests.  Therefore, the October Manager Consent was a valid exercise of Aries Capital's authority and obligations under the plain language of the ACC Operating Agreement and the October Member Consent.

### c. Qualizza Failed to Establish a Scrivener's Error

In a somewhat related argument to his claim that Majority Consent is ambiguous, Qualizza asserts that the term should be read to mean Member Consent, which is defined as 66-2/3% of the ACC member interests entitled to vote.[101]  Qualizza's theory at trial was that the term Majority Consent in Section 7.1(iii) reflects a "Scrivener's Error."  Illinois cases describe a Scrivener's Error as one "resulting from a minor mistake or inadvertence, esp. in writing or copying something on the record."  *Schaffner v. 514 West Grant Place Condo. Ass'n*, 756 N.E.2d 854, 588 (Ill. App. Ct. 2001).  Notable examples include "omitting an appendix from a document; typing an incorrect number; [and] mistranscribing a word."  *Id.* (citing *Black's Law Dictionary* 563 (7th ed. 1999)).  The error must be

---

[100] Neither party argued that the term Majority Consent means the majority of the members of ACC, as opposed to a majority of the membership interests.  Even if that were a reasonable construction, the October Member Consent satisfied that definition, as the consent was executed by two of the three members of ACC.

[101] ACC Operating Agreement § 1.27.

"mechanical or technical" in nature. *Id*. By contrast, "[a]n error that is the deliberate or conscious result of the exercise of judicial or professional judgment, or a misapprehension of the law or the facts, will not qualify as a scrivener's error." *Handelsman v. Handelsman*, 852 N.E.2d 862, 873 (Ill. App. Ct. 2006) (citation omitted).

Qualizza has not established that the use of the term Majority Consent in Section 7.1 is a scrivener's error. Qualizza's reliance on *Dauderman v. Dauderman*, 263 N.E.2d 708 (Ill. App. 1970) is misplaced. In *Dauderman* the words "per month" were omitted from an alimony provision in a domestic relations order. *Id.* at 710. The appeals court concluded that the omission was "clearly clerical in nature," observing that the trial judge's notes reflected that he had directed counsel to include monthly alimony in the order, and that there were written memoranda of counsel for both parties which clearly suggested that periodic, rather than a lump sum, alimony payments were intended. *Id.* at 710–11. The appellate court concluded there was "no doubt" that the omission was the result of a clerical error, and the record was "clear and convincing" that the trial court's amended order reflected what had been intended. *Id*. No such record is present here.

Qualizza can point to no contemporaneous evidence supporting his allegation of a scrivener's error. He offers no communications between or among the drafters

or the members of ACC about the inclusion of Majority Consent in Section 7.1.[102]

Qualizza testified that he recognized this language 15 years ago or more,[103] but he never mentioned it to Freeman and took no steps to have it corrected.[104] To the contrary, Qualizza approved an Amended and Restated ACC Operating Agreement in May 2007 that retained the reference to Majority Consent in Section 7.1(iii).[105] Then, in February 2016, in connection with the conversion of ACC from an Illinois LLC to a Texas LLC, Qualizza and the other members approved another amendment to the ACC Operating Agreement that did not change the Majority Consent language.[106]

---

[102] The Majority Consent language appears to have been included as part of a wholesale revision of Section 7.1 during the drafting process in March 2004. *See* JX 10 at Q_0153543. But there are no contemporaneous communications about that provision.

[103] Qualizza Dep. 219:16–23 ("Q. Okay. When did you first come to the realization that Section 7.1 of the 2004 ACC operating agreement said majority consent instead of member consent? A. When did I come to the conclusion? Q. The realization. A. I don't know, probably 15 years ago, maybe more.").

[104] *Id.* 224:13–23 ("Q. . . . When you came to the realization that the phrase majority consent was used in Section 7.1, did you talk to Neil Freeman about it -- A. No. Q. -- and tell him that you thought was a mistake? A. No. Q. Did you direct any of your attorneys to prepare a draft, a new draft of the agreement to correct what you thought to be mistakes? A. No."); *see also* 226:13–17 ("Q. Okay. When the amended and restated agreement was being executed or drafted in 2007, did you say anything to anyone about changing the term majority consent to member consent in Section 7.1? A. No.").

[105] ACC Operating Agreement § 7.1.

[106] JX 79. Freeman argues that Qualizza's alleged knowledge of the so-called scrivener's error and failure to act for more than a decade constitutes laches and acquiescence. Pl.'s Pretrial Br. 42–44. The court need not reach that issue here because Qualizza has failed to

Qualizza testified that the parties intended that no major decisions would be made without a supermajority vote of ACC's members, and that for approximately twenty years the parties always executed consents with the affirmative vote of at least 66-2/3% of the members.[107] Qualizza also refers to two other sections of the ACC Operating Agreement that refer to actions permitted to be taken by a majority of the membership interests, which do not use the term Majority Consent.[108] These provisions, however, do not demonstrate that the term Majority Consent is ambiguous or that it was a scrivener's error. Indeed, even Qualizza himself was equivocal on this argument: "It could be a scrivener's error; it could be the way it

---

carry his burden to prove that use of the term Majority Consent in Section 7.1(iii) was a scrivener's error.

[107] Qualizza Dep. 220:15–20; Qualizza Aff. ¶¶ 13, 23–25. Qualizza offered the testimony of two of UDF's transactional lawyers, Daniel Kraus and Darryl Jacobs, who testified that they typically obtain consents from a supermajority of the ACC members for each community development project financing transaction to ensure against a later challenge that there was inadequate authority under the ACC Operating Agreement. Jacobs Dep. 18:1–5 ("So we – so every transaction typically has all ACC consents meeting the [66 2/3 majority] threshold, the member consent, because giving a legal opinion, we didn't want somebody to come back and say we didn't have adequate authority."); Kraus Dep. 28:18–29:5. Kraus acknowledged that those consents were obtained in connection with transactions involving the expenditure of more than $5,000, which required approval by a supermajority of the members under subject to Section 7.12. Kraus Dep. 29:6–12. Neither lawyer was involved in the drafting of Section 7.1 of the ACC Operating Agreement. Jacobs Dep. 16:13–17:8; Kraus Dep. 23:24–24:1 ("I would have only dealt with the tax provisions of the document."). Kraus had no discussion with anyone prior to this litigation about the term Majority Consent in Section 7.1. *Id*. 25:18–22. Nor did either lawyer suggest amending the agreement to change the language of Section 7.1. Jacobs Dep. 29:11–30:1; *see* Kraus Dep. 25:18:22.

[108] *See* ACC Operating Agreement §§ 6.2, 6.4.

was meant to be."[109]  Qualizza cannot establish a scrivener's error after he acknowledged, under oath, that the alleged scrivener's error might not be a scrivener's error.

Qualizza's scrivener's error argument is also inconsistent with positions that he took earlier in this case, when he acknowledged that he could be removed as manager of UDF by majority consent of the ACC members:

> If Aries Capital, as manager of ACC, desired to remove Qualizza as manager of UDF it needed to call a meeting of the members of ACC and receive authority from them under Section 7.1(iii) of the ACC Operating Agreement. . . . Further, Aries Capital's membership interest in ACC is only 46% and, Freeman, through Aries Capital, would be unable to cause ACC to take such action on his own.[110]

To be sure, Qualizza argued that Section 7.1 "limits power of manager to 'daily operations' or as specifically authorized by a vote of *a majority of the members*."[111]  Qualizza has not established that the term Majority Consent in Section 7.1(iii) of the ACC Operating Agreement reflects a transcription error or some other mechanical mistake.  It may arguably have been the result of a misapprehension of the law or the facts, but under *Handelsman*, that type of mistake falls expressly

---

[109] Qualizza Dep. 223:8–10.

[110] Def.'s Opposition to Mot. to Expedite ¶ 29.

[111] *Id*. ¶ 31 (emphasis added).

outside of the scrivener's error doctrine. The term Majority Consent in Section 7.1(iii) is neither ambiguous nor the result of a scrivener's error.[112]

### d. Section 7.12 Does Not Govern this Dispute

In an attempt to circumvent Aries Capital's authority under Section 7.1 of the ACC Operating Agreement, Qualizza argues that Section 7.12 governs the removal of managers of UDF.[113] This section, entitled "Matters Requiring Approval of the Members," enumerates ten specific actions requiring "Member Consent" (defined as the affirmative vote of at least 66-2/3% of the Membership Interests entitled to vote therein).[114] The Section 7.12 list includes, among other things: loans to third parties; sale of ACC property; liquidation, merger, or consolidation of ACC; and expenditures greater than $5,000.[115] Removal of managers (of any kind) is not among them. Nevertheless, Qualizza argues that the removal of the manager of UDF falls within the scope of three of these categories.[116] Qualizza's argument runs

---

[112] Nor has Qualizza established a claim for reformation. Under Illinois law, this court may only reform a contract when the plaintiff satisfies a "higher burden of proof" and proves by "clear and convincing evidence . . . that the instrument as it stands does not properly reflect the true intention of the parties, and that there has been either a mutual mistake or a mistake by one party and fraud by the other." *319 S. La Salle Corp. v. Lopin*, 311 N.E.2d 288, 291 (Ill. App. Ct. 1974). Qualizza does not attempt to satisfy this standard.

[113] Def.'s Pretrial Br. 34.

[114] ACC Operating Agreement §§ 1.27, 7.12.

[115] *Id.* § 7.12(a)–(d).

[116] Def.'s Pretrial Br. 37. Notably, Qualizza does not provide the court with case law (from Illinois, Delaware, or elsewhere) in support of this argument or its sub-points.

counter to the well-established principle that the parties' intent "is to be determined objectively by examining the language the parties agreed upon rather than by any subjective explanation given in hindsight." *William Blair & Co., LLC v. FI Liquidation Corp.*, 830 N.E.2d 760, 775 (Ill. App. Ct. 2005).

First, Qualizza points to Section 7.12(e), which requires a 66-2/3% vote of the members for the "appointment and termination of officers."[117] Qualizza argues that this subsection should be interpreted to "apply not only to ACC officers but also officers of ACC's only asset – UDF" because the term "officers" is not defined in the agreement.[118] This argument is without merit. Under Illinois law, a term is not ambiguous merely because it lacks definition within the agreement. *Hunt*, 831 N.E.2d at 1102.

Section 7.12(e) does not refer to managers—of ACC or any other entity.[119] Section 7.12(e) applies to officers, not officers of another entity. One need only read the sections of the agreement that immediately precede and follow Section 7.12 to

---

[117] ACC Operating Agreement § 7.l2(e); *see id.* § 1.27 (defining Member Consent as "the affirmative vote of the Members representing at least sixty-six and two-thirds percent (66-2/3%) of the Membership Interests entitled to vote on the matter").

[118] Def.'s Pretrial Br. 37. To be clear, this is Qualizza's entire argument on this point. There is no textual analysis of the ACC Operating Agreement or any legal analysis.

[119] This section of the ACC Operating Agreement does not govern the removal of the manager of ACC. The removal of ACC's manager is governed by Section 7.4 of the ACC Operating Agreement.

understand that officers means officers of ACC. *See Gallagher*, 874 N.E.2d at 58 ("A contract must be construed as a whole, viewing each provision in light of the other provisions."). Section 7.11 is titled "Officers" and states that "[t]he Company may have officers."[120] "Company" is defined as ACC "and any successor limited liability company."[121] Viewing the contract as a whole, the term "officers" in Section 7.12 of the ACC Operating Agreement means officers of ACC, not officers of some other entity. There is no ambiguity. If the parties wanted to require a supermajority vote of the members to remove officers of another entity within ACC's control, they knew how to do so. Section 8.1(a) provides for indemnification of any "Person [who] is or was a Manager, officer, manager, employee or agent of the Company . . . [or] who is or was serving at the request of the Company . . . as . . . an officer . . . of another Organization . . . ."[122] Had the drafters of the ACC Operating Agreement intended the term officer to include officers of another organization, they easily could have done so.

Qualizza fails to provide any legal basis to expand the plain meaning of "officers" in Section 7.12 to include the manager of another entity. *See Nat'l Bank of Bloomington v. W. Const. Co.*, 355 N.E.2d 43, 47 (Ill. App. Ct. 1976) ("It is a

---

[120] ACC Operating Agreement § 7.11.

[121] *Id.* § 1.13.

[122] *Id.* § 8.1(a).

general rule governing the construction of contracts that unless a contract is ambiguous, its meaning must be determined from the words used; courts will not, simply because a more equitable result might be reached, construe into the contract provisions that are not there.").

Next, Qualizza looks to Section 7.12(h), which restricts the manager of ACC from "entering into engagements or contractual obligations" without Member Consent.[123] Qualizza argues that "under this provision of the Operating Agreement, Freeman would not be able to appoint himself as Manager of UDF, even if the ACC Manager had any authority to remove the UDF Manager in the first place."[124] This argument is also baseless and unsupported. Qualizza cites no language in the ACC Operating Agreement or any objective fact indicating that ACC did or was required to enter into a separate contract with Freeman when it appointed him as manager of UDF. This language is not reasonably susceptible to any other meaning, and it "is not rendered ambiguous merely because the parties disagree on its meaning." *Thompson v. Gordon*, 948 N.E.2d 39, 48 (Ill. 2011).

Qualizza then cites to Section 7.12(c) which mandates Member Consent for "a liquidation of the Company, a merger or consolidation of the Company with

---

[123] ACC Operating Agreement § 7.12(h).

[124] Def.'s Pretrial Br. 37. Again, this is the entire sum and substance of Qualizza's argument on this issue.

33

another business of entity, or another form of business transacted by the Company which is not in the ordinary course of business." From this language, Qualizza asserts that "[r]emoving the manager of ACC's only asset – the only Manager UDF has had for twenty years – is certainly not in the ordinary course of ACC's business."[125] Qualizza again fails to support this argument with any analysis or textual support. Qualizza focuses solely on the phrase "not in the ordinary course of business," but ignores the other parts of the provision. Section 7.12(c) applies to end stage transactions or engaging in "another form of business" that is not in the "ordinary course of business."[126] *See Ill. St. Bar Ass'n Mut. Ins. Co. v. Leighton Legal Gp., LLC*, 103 N.E.3d 1087, 1095 (Ill. App. 2018) ("a court may determine the meaning of a word by examining the meaning and context of the surrounding words"). It is undisputed that ACC's *only* course of business is controlling UDF, and merely changing managers of UDF does not, of itself, constitute ACC's engagement in "another form of business."[127]

---

[125] Def.'s Pretrial Br. 37.

[126] ACC Operating Agreement § 7.12(c).

[127] Qualizza also points to Section 7.12(d) which mandates Member Consent for "expenditures in excess of Five Thousand Dollars ($5,000)." Def.'s Pretrial Br. 37–38; ACC Operating Agreement § 7.12(d). Qualizza does not argue that replacing UDF's manager falls within this language. Instead, Qualizza argues that "[r]emoval of the only Manager UDF ever had and replacing him with someone who had never managed a Certified Development Entity on a New Market Tax Credit project i*s certainly a far more*

Illinois law is clear: "An agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." *W. Ill. Oil Co. v. Thompson*, 186 N.E.2d 285, 287 (Ill. 1962). Qualizza impermissibly seeks to insert additional terms to Section 7.12 of the ACC Operating Agreement that are contrary to its plain meaning. *See Nat'l Bank*, 355 N.E.2d at 47 ("In construing a contract which purports on its face to be a complete expression of the entire agreement, courts will not insert terms about which the agreement is silent."). Section 7.12 does not govern the removal and appointment of the manager of UDF.

## III. CONCLUSION

For the foregoing reasons, the July Consent and the October Consents are valid under the UDF Operating Agreement and the ACC Operating Agreement. Accordingly, Qualizza was removed as manager of UDF on July 14, 2021, and Freeman was appointed manager of UDF on July 14, 2021. The February 9, 2022 status quo order is hereby vacated.

**IT IS SO ORDERED.**

---

*serious and consequential action than ACC spending $5,000.*" Def.'s Pretrial Br. 37–38. This provision does not address Aries Capital's authority to remove and replace UDF's manager.