No. 2--05--0790                    filed: 7/7/06

_____

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

_____

| | | |
|---|---|---|
| SUSAN HANDELSMAN, Indiv. and as Executor of the Estate of Richard A. Handelsman; and as Trustee of the Trust Agreement establishing the Richard A. Handelsman Revocable Trust, Richard A. Handelsman, Grantor, | ) ) ) ) ) ) | Appeal from the Circuit Court of McHenry County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 02--MR--263 |
| | ) | |
| GARY HANDELSMAN and ROBIN GOULD, | ) ) ) | Honorable Michael J. Sullivan, |
| Defendants-Appellants. | ) | Judge, Presiding. |

_____

_____

JUSTICE BOWMAN delivered the opinion of the court:

Defendants, Gary Handelsman and Robin Gould, the adult children of decedent, Richard A.

Handelsman, appeal a grant of summary judgment (735 ILCS 5/2--1005(c) (West 2004)) to plaintiff,

Susan Handelsman, Richard's widow. The parties are beneficiaries of the Richard A. Handelsman

Revocable Trust (Trust). Using extrinsic evidence of Richard's intent, the trial court held that the

document creating the Trust (Trust Agreement) requires that (1) if the corpus of the Trust is

insufficient to pay the bequests to plaintiff and defendants, plaintiff's bequest must be satisfied to the

extent possible before any funds are paid toward defendants' bequests; and (2) funds from the Trust must be used to pay off the mortgage on certain real estate.

On appeal, defendants contend that the trial court erred in relying on extrinsic evidence of Richard's intent, either to interpret the Trust Agreement or to reform it. According to defendants, the Trust Agreement unambiguously bars the Trust from paying the mortgage and requires that the bequests to plaintiff and defendants abate ratably. They also contend that reforming the Trust Agreement is impermissible. We agree, and we reverse the judgment and remand the cause.

## I. BACKGROUND

Richard Handelsman died on February 8, 2002. He was survived by plaintiff, his wife, and defendants, his adult children from a previous marriage. Richard's will, dated July 29, 1999, left some personal items to plaintiff and directed that his residuary estate would be "added to and become a part of the trust estate of the trust," to be held and administered per the Trust Agreement. As pertinent here, the Trust Agreement provides:

> "THIS AGREEMENT, made this 29 [sic] day of July, 1999, by and between
>
> RICHARD A. HANDELSMAN, of Woodstock, Illinois, as Grantor ***, and RICHARD A.
>
> HANDELSMAN, of Woodstock, Illinois, as Trustee ***;
>
> * * *
>
> ### ARTICLE III
>
> ### Marital Deduction
>
> 3.1 Marital Distribution. On the date of the death of the Grantor, if the Grantor's wife
>
> shall survive him, the Trustee shall distribute to the Grantor's wife from the trust estate of the
>
> trust, including therein any property distributable to the trust pursuant to the *** Grantor's
>
> Will, the amount hereinafter stated in this Article III.

3.2 <u>Amount of Marital Distribution</u>. The Trustee is hereby authorized to select and distribute to the Grantor's wife cash, securities and other assets, including but not limited to real estate or interests therein, in such proportions and amounts as the Trustee shall determine in his sole discretion; provided, however, that in satisfying such distribution, the Trustee shall distribute to the Grantor's wife the following assets:

(a) all real estate located in Woodstock, Illinois, which shall be owned as an asset of the trust estate of the trust, which currently is comprised of 155 acres, more or less, including all buildings, outdoor sculptures and improvements thereon, free and clear of any and all mortgages, which the Trustee shall pay in full prior to the distribution of such property;

(b) the sum of One Million Dollars ($1,000,000.00); and

(c) all of the Grantor's works of fine art.

\* \* \*

## ARTICLE IV

### Specific and Residuary Distributions

4.1 <u>Specific Allocation to Grantor's Children</u>. Upon the death of the Grantor, the Trustee shall allocate the sum of One Million Dollars ($1,000,000.00) to each of Robin and Gary who shall survive the Grantor; \*\*\* provided, however, that in making this allocation, the Trustee shall reduce the amount allocable to Robin or Gary \*\*\* under this Section 4.1 of this Article IV by the amount each has been allocated, outright or in trust, from the Richard A. Handelsman Insurance Trust, created under the Trust Agreement establishing said trust, heretofore created \*\*\*. Each such share so allocated to a descendant of the Grantor shall be retained in trust by the Trustee as a separate trust of which the person for whom such share shall have been allocated shall be the beneficiary \*\*\*.

4.2 <u>Debts and Taxes</u>. Upon the death of the Grantor, to the extent that the assets of the Grantor's estate (other than tangible personal property, property or sums specifically bequeathed or devised or property which in the sole judgment of the Trustee does not have a readily realizable market value) are insufficient, the Trustee (a) is authorized to pay the expenses of the Grantor's last illness, the Grantor's debts (except those secured by mortgage, lien or other encumbrance and not due and payable at the date of the Grantor's death, unless otherwise provided herein or in the Grantor's Will) ***."

Plaintiff's "Second Amended Complaint for Declaratory Judgment for Trust Construction or Trust Reformation" alleged as follows. On or about July 29, 1999, Richard executed both the will and the Trust Agreement. Both documents were prepared by attorneys at Levin & Schreder, and Robert Levin of the firm was familiar with Richard's estate-planning intentions. On February 6, 2002, Richard died, and, on March 1, 2002, plaintiff was appointed the executor of his estate. She had also been designated a co-trustee of the Trust.

Count I of the complaint sought "construction of the Trust due to Ambiguity" and alleged as follows. Richard had intended to provide a "three-tiered" distribution scheme. First, under article 3, plaintiff would receive the 155 acres of real estate mortgage-free, the cash bequest, and the artwork; second, defendants would receive $1 million each; and third, any remaining assets would be divided 50% to plaintiff and 25% to each defendant. However, in two respects, the Trust Agreement was ambiguous, requiring resort to writings by the attorneys who drafted it.

The first alleged ambiguity related to the three-tiered distribution scheme. According to the complaint, the Trust's assets were insufficient to make the full distributions to plaintiff and defendants. However, the Trust Agreement did not clearly say how to adjust for this shortfall. It did not specify whether assets were to be distributed "in the order of the Trust's articles" (in which case

plaintiff would receive whatever the Trust could provide to satisfy article 3 before defendants received anything under article 4) or whether the specific bequests in articles 3 and 4 were to be reduced pro rata. This ambiguity was resolved by Levin's correspondence, which clearly showed that Richard intended the former resolution. In a January 8, 1999, memorandum to Mary Ann Spangler Harris, an associate with Levin & Schreder, Levin wrote:

"[Richard and I] confirmed that the insurance proceeds of $1,000,000 to each of the children should 'replace' the amount that they otherwise would have received under the Revocable Trust. However, in the event that the insurance doesn't pay or anything else happens, we ought to make sure that there is an automatic provision that self-adjusts ***, so that if the insurance is not in force, the kids would get the next $1,000,000 each out of his estate after Susan gets the artwork, the house [and] the mortgage is paid off and $1,000,000 of her own." (Emphasis added.)

On February 25, 1999, Levin wrote Richard, "After Susan receives all of those distributions [later specified in article 3], the next amount of up to $2,000,000 go [sic] to Robin and Gary."

The second alleged ambiguity related to "Distribution of Real Estate and Payment of Mortgages on Real Estate." Section 3.2(a) of the Trust Agreement directed the trustee to distribute the Woodstock real estate to plaintiff "free and clear of any mortgages, which the Trustee shall pay in full." However, this provision erroneously assumed that the real estate was a Trust asset. Actually, the real estate consisted of four parcels, one held in an Illinois land trust and the other three held in a separate Illinois land trust.[1] Under this arrangement, the land trustee (Harris Bank

---

[1]The second amended complaint alleged that there were two properties. However, in an affidavit filed with her motion for summary judgment, plaintiff stated that there were four in all.

Woodstock) held both legal and equitable title to the properties and Richard held only beneficial interests in the trusts. These beneficial interests were personal property. See In re Estate of Crooks, 266 Ill. App. 3d 715, 721 (1994). Thus, when Richard died, only the beneficial interests that he held passed to plaintiff, and so did the obligation to pay an outstanding $555,000 mortgage. As a result, section 3.2(a) could not be carried out literally, and, under the circumstances, it was ambiguous. Although it could be read to require the trustee to pay the mortgage only if the real estate were in the Trust, it could also be read to make the obligations independent, so that the impossibility of the latter did not excuse the performance of the former.

Again, according to the second amended complaint, this ambiguity could be cleared up by referring to the memoranda and letters circulated among Richard's attorneys and Richard. In an October 28, 1998, memorandum to Harris, Levin noted that Richard and plaintiff had recently bought 155 acres and that "[Richard] wants Susan to have the land free and clear." In the February 25, 1999, letter to Richard, Levin explained, "[t]he concept at work here is that, on your death, Susan will receive all of the real estate *** free and clear of any and all mortgages. This means that the first thing that has to be done with any of your free assets is pay off the mortgages so that Susan will receive the entire *** 155 acres free of any mortgage debt."

Count II of the second amended complaint sought reformation of the Trust Agreement, if necessary. It alleged that if, arguendo, the Trust Agreement was unambiguous and did not support the constructions put forth in count I, it should be reformed in accordance with the extrinsic evidence so that Richard's intentions would not be frustrated by his attorneys' "drafting errors."

After defendants answered the second amended complaint, plaintiff moved for summary judgment. She argued that there was no dispute that Richard had intended that (1) plaintiff receive all of her legacy under article 3 before defendants received any of theirs under article 4; and (2)

Trust assets be used to pay off any mortgages on the 155 acres of real estate. Therefore, according to plaintiff, the court should either resolve the ambiguities in the Trust Agreement in her favor or reform the Trust Agreement so as to effectuate Richard's intent.

Plaintiff's motion attached copies of Levin's letters to Harris and Richard and excerpts from two depositions that Levin provided in October 2004. Levin's deposition testimony was consistent with his letters to Harris and Richard. Also, he testified that, at one point, he explained to Richard that, if the Trust's assets were insufficient to make all of the specific bequests to plaintiff and defendants, "[t]hen the kids would get less, you know, that Susan would get hers first and that the kids would say get less. And he said, 'That's exactly right[.]' " Richard was "well aware" that "if there were only the land and enough money to pay off the mortgages and the million dollars and the artwork that Susan would get everything and the kids would get nothing." Asked what language in the Trust Agreement created such a preferential system, Levin testified:

"I don't know that there is necessarily language as much as it is the order in which these things are taken. *** So the fact that the distributions to Susan would be all included in this one article and then there would be a separate article dealing with a million dollars to each of the children, it would be very unlikely that you would look at that and say that somehow the million dollars to each of the children should go back here and be pro rata with the million dollars there."

Levin testified further that Richard had assured him that he, Richard, owned the land trust that held the Woodstock real estate. Levin conceded that the Trust could not own the real estate if the land trustee held both legal and equitable title. However, he noted that Richard's beneficial interest in the real estate was part of the Trust's assets and that the Trust could pay the mortgage whether or not it actually owned the property.

Defendants also moved for summary judgment, contending that the Trust Agreement was unambiguous and that plaintiff could not use extrinsic evidence to avoid its clear import. Specifically, defendants maintained first that, because the Trust Agreement was a "will substitute," it should be construed according to the statutory rules for construing wills (see Restatement (Third) of Property §7.1, at 69, §7.2, at 86 (2003)). Thus, because the Trust Agreement said nothing about a "three-tiered" distribution system, section 24--3(b) of the Probate Act of 1975 (the Probate Act) (755 ILCS 5/24--3(b) (West 2002)) required that the legacies in articles 3 and 4 abate pro rata. Defendants maintained second that article 3.2(a) of the Trust Agreement unambiguously made the transfer of the Woodstock real estate a condition precedent to paying any mortgages on it; thus, because the Trust could not transfer the real estate, Trust money could not be used to pay off the mortgage. Finally, relying on authority that extrinsic evidence may not be used to reform a will (see Turek v. Mahoney, 407 Ill. 476, 482 (1950); In re Estate of Rosta, 111 Ill. App. 3d 786, 797 (1982)), defendants contended that reforming the Trust Agreement, a "will substitute," was similarly impermissible.

The trial court granted plaintiff summary judgment. Relying on Reinberg v. Heiby, 404 Ill. 247 (1949), and In re Estate of Hurst, 329 Ill. App. 3d 326 (2002), the court held that the undisputed evidence of Richard's intent required reforming the Trust Agreement. Therefore, the court ordered the trustee (1) to pay the mortgage on the Woodstock property and reimburse plaintiff for any mortgage payments that she had made from her funds since Richard died; and (2) to distribute assets to plaintiff per article 3, to the extent possible, before distributing anything to defendants.

Defendants timely appealed. They now argue that (1) the Trust Agreement unambiguously requires ratable abatement and prohibits the payment of the mortgage balance; and (2) the trial court lacked the authority to reform the Trust Agreement.

## II. ANALYSIS

### A. Plain Language of the Trust Agreement

We consider first whether the Trust Agreement, absent reformation, supports the judgment. Although the trial court based its decision on the reformation of the document, we may affirm the judgment on any ground called for by the record. See Rubloff CB Machesney, LLC v. World Novelties, Inc., 363 Ill. App. 3d 558, 562 (2006). We agree with defendants that the Trust Agreement is unambiguous in both respects at issue here.

In construing a trust, we seek to ascertain and effectuate the intent of the settlor. Harris Trust & Savings Bank v. Donovan, 145 Ill. 2d 166, 172 (1991). If the trust's language is unambiguous, the settlor's intent must be ascertained from that language. Brown Brothers Harriman Trust Co., LLC v. Bennett, 357 Ill. App. 3d 399, 406 (2005).

We turn first to defendants' contention that the plain language of the Trust is inconsistent with Richard's alleged intent to create a "three-tiered" system for distributing assets and, thus, that the trial court erred in considering extrinsic evidence that Richard intended to create such an arrangement. The Trust Agreement itself does not explicitly say whether, in the event that Trust assets are insufficient to fund fully the specific bequests to plaintiff and defendants, plaintiff should receive preference. Plaintiff maintains that, as a result, the Trust Agreement is ambiguous on the issue of preferential-versus-pro rata abatement. Also, she contends, the Trust Agreement provides some evidence that Richard intended the former, as the bequest to her is set out in a separate paragraph preceding the one making the bequests to defendants. For the reasons that follow, we agree with defendants that the failure to specify a preference does not make the Trust Agreement ambiguous and that the Trust Agreement requires pro rata abatement.

Defendants urge us to follow section 7.2 of the Restatement (Third) of Property (Restatement (Third) of Property §7.2, at 86 (2003)), under which a "will substitute" is, to the extent appropriate, subject to "rules of construction and other rules applicable to testamentary dispositions." Defendants contend that the Trust Agreement is a will substitute and that, in accordance with section 7.2 of the Restatement, it must be construed in accordance with section 24--3(b) of the Probate Act (755 ILCS ILCS 5/24--3(b) (West 2002)). Section 24--3(b) states:

"Unless otherwise provided by the will, if the estate of a testator is insufficient to pay all legacies under his will, specific legacies shall be satisfied pro rata before general legacies, and general legacies shall be satisfied pro rata, without any priority in either case as between real and personal estate." 755 ILCS 5/24--3(b) (West 2002).

Defendants reason that it is logical to apply the rules for construing wills to testamentary trusts that differ from wills in form but not in purpose or substance. We agree.

"Issues of formality and procedure aside, *** the availability of nontestamentary methods of making disposition should not mean that substantive policies applicable to testamentary dispositions have no application. Thus, increasingly, statutes and case law in the various states are coming to recognize *** that the rights of the spouses and creditors of testators and of settlers of revocable trusts are fundamentally alike, because both the testator and the settlor have retained their complete control over the property that is subject to the will or trust instrument. Similarly, whatever the technicalities of concept and terminology, the interests the revocable-trust beneficiaries will receive on the death of the settlor should, generally at least, receive the same treatment and should be subject to the same rules of construction as the 'expectancies' of devisees." Restatement (Third) of Trusts §25, Comment a, at 379 (2003).

As one commentator reasons, "[t]he owner who retains both the equitable life interest and the power to alter and revoke the beneficiary designation has used the trust form to achieve the effect of testation. Only nomenclature distinguishes the remainder interest created by such a trust from the mere expectancy arising under a will." J. Langbein, The Nonprobate Revolution and the Future of the Law of Succession, 97 Harv. L. Rev. 1108, 1113 (1984). We adopt the Restatement's principle that, in general, will substitutes are to be construed according to the rules used to construe wills.

Plaintiff contends that the Trust Agreement is not a "will substitute," because Richard executed a valid will. Plaintiff's argument misses the point. Section 7.1 of the Restatement defines a will substitute as "an arrangement respecting property or contract rights that is established during the donor's life, under which (1) the right to possession or enjoyment of the property or to a contractual payment shifts outside of probate to the donee at the donor's death; and (2) substantial lifetime rights of dominion, control, possession, or enjoyment are retained by the donor." Restatement (Third) of Property §7.1, at 69 (2003). The Trust Agreement satisfies this definition, whether or not Richard also executed a will. A will and a will substitute may coexist. Moreover, to hold that the existence of Richard's will means that the Trust Agreement is not a will substitute would exalt form over substance. Richard's pour-over will disposes of a limited amount of personal property and directs that the bulk of his estate be allocated according to the Trust Agreement. We agree with defendants that the Trust Agreement is a will substitute and that abatement is governed by section 24--3(b) of the Probate Act. Under section 24--3(b), abatement must be ratable and not preferential unless the Trust Agreement shows a contrary intention.

Plaintiff contends that the inclusion of the competing bequests in separate paragraphs, with one paragraph preceding the other, implies that Richard intended that the bequest to plaintiff be satisfied to the extent possible before those to defendants may be satisfied at all. We disagree. As

defendants note, plaintiff cites no authority for the purported rule that listing specific legacies separately means that they do not abate pro rata. Moreover, there is authority to the contrary.

In In re Estate of Fleer, 21 Ill. App. 3d 56 (1974), article 4 of the decedent's will made bequests to specified legatees, including several minors. Article 5 made general bequests to various eleemosynary institutions. The minors' guardian ad litem argued that, should the estate's assets be insufficient to pay the bequests in both articles, those specified in article 5 should abate in full before any of those in article 4 abated. Among the various reasons that the guardian gave was the order in which the bequests were made.

The appellate court disagreed and held that, if abatement were required, the bequests in the two articles would abate pro rata. The court relied on section 291(b) of the Probate Act (Ill. Rev. Stat. 1973, ch. 3, par. 291(b)), which was similar to the current section 24--3(b). Fleer, 21 Ill. App. 3d at 59. The court reasoned that, under section 291(b), the presumption of ratable abatement may be overcome only by a clear indication, set forth in the will, of a contrary intention. That intention could not be "derived from such inferences as the guardian ad litem [sought] to draw here." Fleer, 21 Ill. App. 3d at 59.

Following Fleer, we hold that the Trust Agreement does not show that Richard intended that abatement be other than pro rata. Therefore, we agree that the Trust Agreement is unambiguous and requires that any abatement be prorated among the bequests in articles 3 and 4.

B. Transfer of Real Estate

We turn to the second disputed aspect of the Trust Agreement, section 3.2(a). Defendants argue in part that this section unambiguously conditions any payment of the mortgage on the transfer of the real estate at issue to plaintiff and that, because the transfer is impossible (as the real estate is not a Trust asset), any mortgage on the land may not be paid off from the Trust. Plaintiff concedes

that section 3.2(a) cannot be executed insofar as it purports to transfer the real estate to her, but she maintains that there is at least room for disagreement over whether section 3.2(a) requires the transfer as a condition precedent to paying the mortgage balance from Trust assets.

We agree with defendants that section 3.2(a) is not ambiguous. Section 4.2 specifically forbids the trustee from paying Richard's debts that are "secured by mortgage *** and not due and payable at the date of [Richard's] death, unless provided otherwise herein or in [Richard's] will." Section 3.2(a), the only possible pertinent exception to this prohibition, states that the trustee shall distribute to Susan "all real estate located in Woodstock, Illinois, <u>which shall be owned as an asset of the trust estate of the trust</u> *** free and clear of any and all mortgages, which the Trustee shall pay in full prior to the distribution of such property."  (Emphasis added.)

We determine that section 3.2(a) limits the payment of any mortgage to such Woodstock property as "shall be owned as an asset of the trust estate of the trust."  To read the emphasized language otherwise would make it superfluous.  Furthermore, section 3.2(a) does not make the payment of the mortgage separate from the transfer of the property; they are mentioned in the same sentence and are supposed to take place in sequence. We conclude that the intent of section 3.2(a) is that no Trust assets shall be used to pay any mortgage unless the trustee fulfills the obligation to transfer real property that is actually a Trust asset.  A contrary intention could have been stated clearly and easily.  Because none of the Woodstock real estate was a Trust asset when Richard died, section 3.2(a) does not authorize paying any of the mortgage with Trust funds.  Therefore, the trial court's decision on this issue is contrary to the intent expressed by the Trust Agreement.

### C. Reformation of the Trust Agreement

We turn to whether the trial court erred in reforming the Trust Agreement.  The trial court concluded that reformation was needed to effectuate what the court saw as Richard's true intentions.

On appeal, defendants contend that the reformation of a will substitute should be impermissible, just as the reformation of wills is not permitted in Illinois. Defendants also maintain that the cases that the trial court relied on are distinguishable. We agree.

Earlier, we held that, in general, the construction of will substitutes should be governed by the same rules as the construction of wills, and we applied this principle to the resolution of the issue of ratable abatement. For the reasons that we gave earlier, we apply the same principle to the reformation of will substitutes such as the Trust Agreement.

As defendants point out, Illinois courts have long held (with narrow exceptions not pertinent here) that "[a] will cannot be reformed to conform to any intention of the testator not expressed in it, no matter how clearly a different intention may be proved by extrinsic evidence." Turek, 407 Ill. at 482; see also, e.g., Stevenson v. Stevenson, 285 Ill. 486, 493-94 (1918); Rosta, 111 Ill. App. 3d at 797. The reasons for this strict rule are (1) that the use of extrinsic evidence to deviate from the unambiguous terms of the will would flout the statutory requirement that all wills be in writing (755 ILCS 5/4--3(a) (West 2002); see Bingel v. Volz, 142 Ill. 214, 223 (1892)); and (2) that, as defendants here argue, allowing the use of extrinsic evidence to rewrite a unilateral disposition by one now deceased would risk opening the floodgates to litigation over the settlor's "true" intentions (see Decker v. Decker, 121 Ill. 341, 357 (1887)).

We acknowledge that this reasoning does not apply completely to will substitutes, as there is no statutory requirement that they be written, witnessed, and attested as wills must be (see 755 ILCS 5/4--3(a) (West 2002)). However, the effect of allowing the reformation of a will substitute is similar to that of allowing the reformation of a will: to enable a stranger to the original proceeding to "make a will [substitute] for the [settlor]." Decker, 121 Ill. at 357; see Engelthaler v. Engelthaler, 196 Ill. 230, 235 (1902) ("A testamentary beneficiary has no equity against the heir, and this is one

reason why a court of chancery will not undertake to rectify a mistake in a will"). For this reason, we shall not endorse what would be an artificial distinction between wills and will substitutes. If a will substitute is unambiguous, then the use of extrinsic evidence to override the expressed intent of the settlor raises the same concerns, noted in Decker and Engelthaler, that are raised by the use of extrinsic evidence to reform an unambiguous will. We note that, even in cases involving trusts that are not will substitutes, Illinois courts have stressed that the use of extrinsic evidence to nullify the effect of unambiguous language should be allowed "only in extreme cases." In re Estate of McInerny, 289 Ill. App. 3d 589, 598 (1997). Therefore, we do not innovate radically by subjecting will substitutes to the same restrictions on reformation as apply to wills.

Plaintiff contends, and the trial court concluded, however, that reformation of the Trust Agreement is permissible under Reinberg v. Heiby, 404 Ill. 2d 247 (1949), and In re Estate of Hurst, 329 Ill. App. 3d 326 (2002). We disagree.

In Reinberg, the parties were the two daughters of John Jarmuth, who created a trust that divided a 24-acre property into two parcels and conveyed one parcel to each daughter. The land had been acquired as two separate tracts, one 20 acres and the other 4 acres. A surveyor prepared a plat of survey dividing the 24 acres into two equal tracts, labeled "Tract A" and "Tract B." Jarmuth then gave an attorney, LeVine, a copy of the plat of survey and documents of title to the property. He told LeVine of his plan to give part of the property to each daughter. Reinberg, 404 Ill. at 248-49.

After taking these steps, Jarmuth met with his daughters, told them that he wanted to divide his property equally between them, and had them draw lots. The defendant drew "A" and the plaintiff drew "B." Jarmuth then showed his daughters the plat of survey with its equal division of the 24 acres. A few months later, however, LeVine prepared a deed in trust that conveyed the 24 acres to a trustee and designated the original 20-acre tract as "Tract A" and the original 4-acre tract

as "Tract B."  LeVine also prepared a trust agreement between Jarmuth and the trustee, similarly labeling the 20-acre tract as "Tract A" and the 4-acre tract as "Tract B" and stating further that, on Jarmuth's death, the trustee should convey the title to "Tract A" to the defendant and the title to "Tract B" to the plaintiff. LeVine admitted later that he inadvertently copied the descriptions of the properties from the original title documents instead of from the plat of survey, as he had been instructed.  The plaintiff and the defendant both signed the trust agreement as beneficiaries. Reinberg, 404 Ill. at 249-50.

After Jarmuth died, the trustee conveyed the tracts according to the trust agreement. Discovering that she had received only 4 acres of the original 24-acre property, the plaintiff sued to reform the trust agreement, alleging that the division of the property into two unequal tracts was the result of a scrivener's error and contrary to Jarmuth's intent.  Reinberg, 404 Ill. at 250-51.  The trial court agreed, holding that relief was available to correct the "mutual mistake of the grantor and plaintiff and defendant, the donee beneficiaries."  Reinberg, 404 Ill. at 251.

The supreme court affirmed.  The court noted that, in general, a grantee of a voluntary conveyance could not obtain reformation of the deed against the grantor or one claiming through the grantor, as the grantee had given no consideration in exchange for "the grantor's bounty." Reinberg, 404 Ill. at 253.  This was so even when the grantee rested his claim upon a scrivener's error (Reinberg, 404 Ill. at 253), as was the situation before the court (Reinberg, 404 Ill. at 250).

Nonetheless, the court held that the plaintiff could obtain reformation against the defendant. The court emphasized that the plaintiff was seeking relief against a co-beneficiary of the trust and not against the settlor or one claiming through him.  Reinberg, 404 Ill. at 254.  Thus, reformation was available because "[t]he power and authority of a court of equity to correct the mistakes of a scrivener incorporated into a contract, deed, or other instrument is *** well known."  (Emphasis

added.) Reinberg, 404 Ill. at 255. Therefore, equity required that the defendant be divested of "the portion of the property which she undeservedly acquired by an admittedly mutual mistake of all the parties to the trust agreement." (Emphasis added.) Reinberg, 404 Ill. at 256.

We agree with defendants that Reinberg is distinguishable. First, Reinberg is limited to the correction of scrivener's errors. Although plaintiff repeatedly refers to the "scrivener's errors" committed by Richard's attorneys, that characterization cannot withstand scrutiny. According to count II of plaintiff's second amended complaint, Richard's attorneys failed in two respects. First, they believed that the Trust Agreement, by setting out plaintiff's legacy in a paragraph preceding the paragraph setting out defendants' legacies, created a scheme of preferential abatement. Second, they erroneously believed that Richard owned the Woodstock real estate and thus that the real estate was an asset of the Trust, and therefore they drafted article 3.2(a) to require the trustee to transfer title to the real estate to plaintiff and, before doing so, to pay off any mortgages on it. Neither of these decisions can be characterized as a "scrivener's error."

A "scrivener's error" or "clerical error" is one " 'resulting from a minor mistake or inadvertence, esp. in writing or copying something on the record, and not from judicial reasoning or determination. ' " (Emphasis omitted.) Schaffner v. 514 West Grant Place Condominium Ass'n, 324 Ill. App. 3d 1033, 1042 (2001), quoting Black's Law Dictionary 563 (7th ed. 1999). Thus, an error that is "decisional or judgmental" instead of "mechanical or technical" is not a scrivener's error. Schafner, 324 Ill. App. 3d at 1040. An error that is the deliberate or conscious result of the exercise of judicial or professional judgment, or a misapprehension of the law or the facts, will not qualify as a scrivener's error. See, e.g., Schaffner, 324 Ill. App. 3d at 1042 (deliberate omission of parking spaces from condominium declaration was not scrivener's error); People v. Mast, 305 Ill. App. 3d 727, 734 (1999) (omission of crucial representation in defense attorney's Rule 604(d) certificate was

not scrivener's error); <u>United State v. Gibson</u>, 356 F.3d 761, 766 n.3 (7th Cir. 2004) (where, as a result of the parties' and the trial court's misapprehension of the maximum sentence for an offense to which the defendant pleaded guilty, the court sentenced the defendant to more than the maximum, such a mistake was "not one of transcription, but of legal knowledge or analysis").

Here, the mistakes that Richard's attorneys allegedly made, and upon which plaintiff rests her argument for reformation, were not mere scrivener's errors. Unlike LeVine in <u>Reinberg</u>, who was given proper information and told to write it down, yet carelessly failed to do so, Richard's attorneys made deliberate choices that were based on erroneous perceptions of the law or the facts. The attorneys committed their alleged errors in the exercise of their professional responsibilities. As Levin testified, he (mistakenly) assumed that the mere structure of the Trust Agreement would create a preferential system of abatement instead of a <u>pro rata</u> system, and, for that reason, he intentionally drew up the pertinent provisions of the Trust Agreement in their present form. Similarly, he mistakenly believed (as apparently did Richard) that Richard owned the land trust that held the Woodstock properties and thus that the real estate itself was an asset of the Trust. Richard's attorneys did not make errors in drafting but in the legal or factual assumptions that they brought to the drafting process. Therefore, <u>Reinberg</u> does not help plaintiff.

Also, <u>Reinberg</u> appears to be distinguishable on a second ground. In <u>Reinberg</u>, the party who sought to benefit from the attorney's error was herself a party to the original trust agreement. Therefore, the mistaken description of the property at issue was attributed to her as well as to the settlor, and the supreme court held that equity required her to return property that she "undeservedly acquired by an admittedly mutual mistake of all the parties." <u>Reinberg</u>, 404 Ill. at 256. Here, by contrast, defendants had no role in the creation of the Trust Agreement and never signed it and

cannot be said to have participated in making the mistakes of which plaintiff now complains. Thus, the doctrine of mutual mistake, on which <u>Reinberg</u> appears to have relied, does not apply here.

Plaintiff's invocation of <u>In re Estate of Hurst</u>, 329 Ill. App. 3d 326 (2002), as well as <u>Neuburger v. Foreman Bros. Banking Co.</u>, 239 Ill. App. 173 (1925), is also unavailing. In neither case was the reformation of a will or will substitute at issue. In <u>Hurst</u>, the court held only that a promissory note could be reformed on the ground of mutual mistake. <u>Hurst</u>, 329 Ill. App. 3d at 336. In <u>Neuburger</u>, the plaintiff was the settlor of a trust agreement, and he sued the trustee for reformation. The court held that he was entitled to the correction of a scrivener's error that resulted from the mutual mistake of the parties to the agreement. <u>Neuburger</u>, 239 Ill. App. at 185-87. These cases have no bearing on the issues here.

III. CONCLUSION

We reverse the judgment of the circuit court of McHenry County and remand the cause for proceedings consistent with this opinion.

Reversed and remanded.

McLAREN and BYRNE, JJ., concur.