******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

BARBARA HEIBECK ET AL. *v.* MARTIN
JOHN HEIBECK ET AL.
(AC 46570)

Elgo, Cradle and Prescott, Js.

*Syllabus*

The defendants appealed from the judgment of the Superior Court reversing a Probate Court decree that declared null and void a lease executed by the plaintiffs and the owner-lessor, G. The lease instrument, which was incorporated by reference in the will of G, was executed in 2016 and commenced on the date of G's death, which occurred in 2019. On appeal, the defendants claimed that the court improperly concluded that the lease was valid. *Held*:

The trial court properly concluded that the lease was valid, as the lease, which conferred rights in the plaintiffs prior to the death of G, was contractual rather than testamentary in nature and functioned more as a will substitute than a testamentary instrument.

Argued September 9—officially released December 24, 2024

*Procedural History*

Appeal from the decree of the Probate Court for the district of Norwalk-Wilton granting the motion of the named defendant et al. to invalidate a lease, brought to the Superior Court in the judicial district of Stamford-Norwalk, and tried to the court, *Hon. Charles T. Lee*, judge trial referee; judgment reversing the Probate Court's decree, from which the named defendant et al. appealed to this court. *Affirmed*.

*Michael P. Kaelin*, for the appellants (named defendant et al.).

*Andrew B. Nevas*, with whom, on the brief, was *Kristen G. Rossetti*, for the appellees (plaintiffs).

*Opinion*

ELGO, J. In this probate appeal, the defendants Martin John Heibeck, Thomas Edward Heibeck, Michael William Heibeck, and George Stephen Heibeck appeal

from the judgment of the Superior Court rendered in favor of the plaintiffs, Barbara Heibeck and Skylar Smith.[1] On appeal, the defendants claim that the court improperly deemed valid a commercial lease executed in 2016 whose lease term commenced upon the death of the owner-lessor in 2019. We affirm the judgment of the Superior Court.

The facts of this intrafamily dispute are not contested. At all relevant times, the family patriarch, George W. Heibeck (George), owned commercial real property known as 943 and 951 Danbury Road in Wilton (property). The property contains multiple buildings that house a gas station, a nail salon, a hair salon, and a well-known seasonal restaurant known as the Heibeck Food Stand (food stand) that the Heibeck family opened more than ninety years ago.[2]

As the court found in its memorandum of decision, George entered into a five year lease with an unrelated third party on September 11, 2012, to operate a nail salon in part of the log cabin on the property (nail salon lease). That lease obligated the lessee to pay utility costs and $2000 in monthly rent.[3]

On April 22, 2015, George entered into a lease with the plaintiffs for the food stand "and its adjacent exterior surroundings" on the property (food stand lease). The term of that lease was thirty-five years, concluding on

---

[1] Although Stephen B. Keough was also named as a defendant, all references herein to the defendants are to Martin John Heibeck, Thomas Edward Heibeck, Michael William Heibeck, and George Stephen Heibeck only. See footnote 6 of this opinion. For clarity, we refer to the parties individually by first name.

[2] In its memorandum of decision, the court found that the hair and nail salons are located in a building on the property known as the log cabin. For convenience, we employ that nomenclature in this opinion as well.

[3] In a June 6, 2022 affidavit submitted in opposition to the defendants' motion for summary judgment, Barbara averred that this nail salon establishment was "no longer operating" on the property. Skylar testified similarly at trial.

April 22, 2050, and provided for a possible extension for two additional terms of five years. The food stand lease obligated the plaintiffs to pay utility costs and $1500 in monthly rent. The food stand lease also included a right of first refusal, which granted the plaintiffs an option to purchase the leased premises in the event that George received a bona fide offer during the term of the lease.

On January 1, 2016, George entered into a ten year lease with Barbara to operate a hair salon in part of the log cabin (hair salon lease). That lease obligated Barbara to pay utility costs and $2000 in monthly rent. The hair salon lease provided for a possible extension for a term of ten years.

On or before June 21, 2016, George entered into a lease with the plaintiffs that pertained to the food stand, the log cabin, and appurtenant parking spaces on the property (99 year lease).[4] The term of that lease was ninety-nine years "commencing on the date of [George's] death." The 99 year lease expressly was subject to the three existing leases on the property—namely, the nail salon, hair salon and food stand leases. In addition, the 99 year lease obligated the plaintiffs to "pay all expenses of the demised premises," to "maintain the buildings and grounds so that they do not fall into disrepair," to "pay real estate taxes" on the leased premises, to pay the plaintiffs' "own utilities," and to "keep the premises insured against liability and fire and other forms of casualty." The 99 year lease further provided that the plaintiffs "may at any time sub-lease" the leased premises, may "mortgage [their] leasehold interest," and "may if they wish cancel or revise the

---

[4] Skylar was the only witness at trial. In its memorandum of decision, the court found that Skylar testified "without objection" that the third lease had been signed "on or before June 21, 2016." In her sworn affidavit submitted in opposition to the defendants' motion for summary judgment, Barbara likewise averred that the 99 year lease was executed on June 21, 2016.

[n]ail [s]alon lease and the [food stand lease] since [Barbara] is now both [l]essor and [l]essee."[5]

On June 21, 2016, George executed his last will and testament (will). Relevant to this appeal are two "specific legacies" set forth therein. Article VI, § 1, states in relevant part: "I give devise and bequeath to [Barbara] a ninety-nine (99) year [l]ease (which has already been signed but to be effective upon date of my death and recorded upon my death) on the building occupied by her hair salon, by a nail salon rented to a third party, and by the [food stand], and surrounding area all as described in said 99 year [l]ease which has been executed by myself, by my daughter [Barbara], and by my grandson [Skylar]. As set forth in said 99 year [l]ease, there are to be no rent payments but [the plaintiffs are] to pay all expenses related to the leased premises. She may continue to sub-lease to the tenant of the nail salon, as sub-landlord. She shall be in full control of the property [described in the 99 year lease]."

In article VI, § 2, of the will, George bequeathed the entirety of the property to the defendants—including the gas station, the food stand, and the log cabin—subject to the terms of the 99 year lease, stating in relevant part: "This entire gift of the entire [property] is . . . subject to [the 99 year lease] to [the plaintiffs], which lease become[s] effective upon the date of my death."

On January 14, 2019, George entered into a five year lease with a limited liability company formed by the defendants known as Heibeck Motors Sons, LLC, to operate a gas station on the property (gas station lease).

---

[5] A review of the leases in question, which were admitted into evidence, indicates that Barbara was not a party to the nail salon lease. Rather, she was the sole lessee in the hair salon lease. To the extent that this provision of the 99 year lease appears to contain a scrivener's error, we note that neither party has raised such a claim in these proceedings.

That lease obligated Heibeck Motors Sons, LLC, to pay utility costs and $1370 in monthly rent. The gas station lease provided for a possible extension of five years.

George died on February 26, 2019. On July 26, 2019, Barbara filed a petition to admit his will to probate with the Probate Court for the district of Norwalk-Wilton. In response, the defendants filed an objection to that petition and sought the appointment of a temporary administrator of George's estate. The Probate Court thereafter appointed Attorney Stephen B. Keough as temporary administrator of the estate.[6] On December 30, 2020, the plaintiffs paid one half of the real estate taxes on the property.

On March 23, 2021, the defendants filed a motion with the Probate Court to declare the 99 year lease null and void. The plaintiffs objected to that motion, and the Probate Court heard argument from the parties on May 24, 2021. On August 3, 2021, the Probate Court granted the defendants' motion and issued a decree in which it declared the 99 year lease invalid.

From that decree, the plaintiffs appealed to the Superior Court. In their complaint, the plaintiffs alleged, inter alia, that the 99 year lease "is a valid commercial lease, not a testamentary instrument . . . ." In their answer, the defendants denied that allegation and further alleged, as a special defense, that the plaintiffs had "defaulted in their obligations under the [99 year lease] by not paying their share of real estate taxes under the terms of the lease . . . ." The plaintiffs denied that special defense.

On April 22, 2022, the defendants filed a motion for summary judgment, claiming that they were entitled to

_____

[6] Although Attorney Keough was named as a defendant in the plaintiffs' appeal to the Superior Court, he neither appeared nor participated in that proceeding. He likewise has not appeared or participated in this appeal.

judgment as a matter of law because "there is no genuine issue that the lessor did not own the real property at the time the lease was to become effective and was to commence . . . ." The plaintiffs filed an opposition to that motion, which was accompanied by the sworn affidavit of Barbara dated June 6, 2022. On October 12, 2022, the court denied the defendants' motion, concluding that genuine issues of material fact existed as to "whether the lease was binding when it was executed by the parties . . . ."

The court held a trial de novo on February 1, 2023, at which it admitted documentary evidence from the parties and heard testimony from Skylar. In its subsequent memorandum of decision, the court set forth detailed findings of fact and ultimately concluded that the 99 year lease was valid. The court also rejected the defendants' special defense. It therefore sustained the plaintiffs' appeal, reversed the decree of the Probate Court, and remanded the matter to that court for further proceedings. From that judgment, the defendants now appeal.

At the outset, we note what is not at issue in this appeal. The defendants do not challenge the factual findings of the Superior Court or its decision rejecting their special defense. They likewise do not dispute the court's determinations that George intended to make "his devise of the entire property to [the defendants] subject to the [99 year lease]" and that "[i]t was the intent of [George] that [the plaintiffs] would have the right to occupy and operate [the food stand] and that the businesses in the log cabin would be under [the plaintiffs'] control. . . . George wanted [the food stand] to continue under the management of [the plaintiffs] for a long time after his death, specifically, ninety-nine years."

The defendants' sole claim on appeal is that the court improperly concluded that the 99 year lease was valid

because an owner of real property does not have the legal authority to enter into a lease whose term commences upon the owner-lessor's death. We do not agree.

Our review of the defendants' claim is guided by certain well established precepts. "An appeal from a Probate Court to the Superior Court is not an ordinary civil action. . . . When entertaining an appeal from an order or decree of a Probate Court, the Superior Court takes the place of and sits as the court of probate. . . . In ruling on a probate appeal, the Superior Court exercises the powers, not of a constitutional court of general or common law jurisdiction, but of a Probate Court." (Citations omitted.) *Kerin* v. *Stangle*, 209 Conn. 260, 263–64, 550 A.2d 1069 (1988). In cases in which no record was made of the proceedings before the Probate Court, "the Superior Court [is] required to undertake a de novo review of the Probate Court's decision."[7] (Internal quotation marks omitted.) *Salce* v. *Cardello*, 348 Conn. 90, 104, 301 A.3d 1031 (2023); see also *Kerin* v. *Stangle*, supra, 264 (function of Superior Court in appeals from order or decree of Probate Court "is to take jurisdiction of the order or decree appealed from and to try that issue de novo"). The defendants' claim regarding the validity of a lease whose term commences upon the death of the owner-lessor presents a question of law over which our review is plenary. See *Salce* v. *Cardello*, supra, 104; see also *Hynes* v. *Jones*, 175 Conn. App. 80, 93, 167 A.3d 375 (2017), rev'd on other grounds, 331 Conn. 385, 204 A.3d 1128 (2019).

We begin by noting the anomalous scenario presented in this case, which involves both a written lease instrument executed by George and the plaintiffs, and a will that incorporates that lease instrument by reference. We therefore consider, as a threshold matter, whether

---

[7] The parties in the present case have stipulated that no record was made of the Probate Court proceedings.

the 99 year lease is contractual or testamentary in nature.[8]

As our Supreme Court has observed, "[a] lease is a contract." (Internal quotation marks omitted.) *David Caron Chrysler Motors, LLC* v. *Goodhall's, Inc.*, 304 Conn. 738, 749, 43 A.3d 164 (2012); see also *AGW Sono Partners, LLC* v. *Downtown Soho, LLC*, 343 Conn. 309, 342 n.29, 273 A.3d 186 (2022) (noting "the modern trend of treating real property leases as contractual in nature, rather than as assignments of property rights" (internal quotation marks omitted)); *Milford Paintball, LLC* v. *Wampus Milford Associates, LLC*, 117 Conn. App. 86, 89–91, 978 A.2d 118 (2009) (noting that "[a] lease is like any other contract" and concluding that lease in question was "binding and effective on the date on which the lease was executed," despite fact that its lease term commenced on future date (internal quotation marks omitted)). In the present case, the parties agree that the 99 year lease constitutes a bilateral contract between George and the plaintiffs.[9] It imposes specific obligations on the plaintiffs and contains a "default" provision, pursuant to which the lease may be cancelled in the event that the plaintiffs fail to satisfy those obligations.

In *Dutra* v. *Davis*, 70 R.I. 318, 323, 38 A.2d 471 (1944), the Supreme Court of Rhode Island confronted the question of "whether the instrument [at issue] is testamentary or contractual" in nature. In resolving that question, the court emphasized that "[t]he title, form and language of the instrument is not that of a will but rather

---

[8] As the parties acknowledged at oral argument before this court, Connecticut authority on the novel issue presented in this appeal is scant. Our inquiry, therefore, is aided by relevant authority from sibling jurisdictions and secondary sources.

[9] At oral argument before this court, the defendants' counsel remarked that "there is no disputing that the lease that is at issue here is a bilateral contract that [imposes] obligations from landlord to tenant and from tenant to landlord."

that of contract"; id.; and that "[t]he instrument contains no words that are usually employed in making a testamentary gift." Id., 323–24. The same is true with respect to the 99 year lease at issue here. Moreover, the fact that the 99 year lease and George's will were executed on the same date; see footnote 4 of this opinion; further indicates that the 99 year lease is not testamentary in nature. See *In re O'Connor's Estate*, 273 Pa. 391, 395, 117 A. 61 (1922) ("[w]here a decedent has done two acts, one of which is distinctively testamentary in form, and the other and later act is as distinctively nontestamentary in form, and is couched, with strict technical propriety, in the apt language of contract, there is no reason for holding the latter testamentary" (internal quotation marks omitted)); see also 1 W. Bowe & D. Parker, Page on the Law of Wills (Rev. Ed. 2003) § 6.17, p. 292 ("[e]xecuting an instrument, which is clearly a will, at the same time as the instrument in question, tends to show that the latter is not a will").

Although the term of the 99 year lease commences on the date of George's death, it nonetheless remains that "not every instrument which provides for performance at or after death is testamentary in character. If the instrument creates a right in the promisee before the death of the testator, it is a contract." *In re Howe's Estate*, 31 Cal. 2d 395, 398, 189 P.2d 5 (1948); accord *In re Lundgren's Estate*, 250 Iowa 1233, 1237, 98 N.W.2d 839 (1959) ("[a]n instrument by which the maker grants an estate or interest in praesenti, though possession and enjoyment are postponed until after his death, is not testamentary"); *In re Jacobson*, 256 Md. App. 369, 395, 286 A.3d 600 (2022) (testamentary instrument "creates no present interest in the testator's property"); *In re Galewitz' Estate*, 206 Misc. 218, 221, 132 N.Y.S.2d 297 (1954) ("Whether an instrument is a valid contract or is an attempted testamentary instrument depends upon the intention of the parties. The test in such case

is whether the contract confers a fixed right in the parties to it at the time it is made or whether it is to have no effect at all until the death of either."), aff'd, 285 App. Div. 947, 139 N.Y.S.2d 897 (1955); *In re Murphy's Estate*, 191 Wn. 180, 191, 71 P.2d 6 (1937) ("[v]iewing the provisions of the lease as a whole, we feel that this instrument conveyed some present interest"); 1 W. Bowe & D. Parker, supra, p. 290 ("[i]f the instrument creates a right in the promise before the death of the promisor, the instrument is a contract regardless of the date set for performance").

The 99 year lease creates such a right, providing in relevant part that the plaintiffs "may at any time sub-lease, assuming that the sub-lease does not violate any then existing leases upon the premises." The grant of a right to the plaintiffs to sublease their interest in the premises "at any time" stands in stark contrast to the rent provision of the 99 year lease, which states that "[t]here shall be no rent *during the term* of this [l]ease." (Emphasis added.) By its plain language, the 99 year lease conveyed a present right to the plaintiffs to sub-lease their future interest in the premises.[10] Had the parties intended to limit the right of the plaintiffs to sublease that interest *only* during the term of the lease, they could have so provided. See *Connecticut National Bank* v. *Rehab Associates*, 300 Conn. 314, 323, 12 A.3d 995 (2011) ("an examination of the contract as a whole reveals that where the parties intended to include lim-iting language, they did so"). Instead, the 99 year lease expressly authorized them to sublease that interest at any time.

In addition, the 99 year lease expressly grants the plaintiffs "permission to mortgage [their] leasehold

---

[10] As but one example, the plaintiffs could agree to sublease the nail salon in the log cabin on the property while continuing to operate the food stand and the hair salon themselves.

interest." Unlike the rent provision of the 99 year lease, that contractual right to mortgage the leasehold interest contains no limiting language whatsoever, which further suggests that the 99 year lease is contractual, rather than testamentary, in nature.

Revocability is another critical distinction between testamentary and contractual instruments. As the Supreme Court of Washington explained, "[t]he difference in effect between a contractual obligation and a testamentary disposition is that the former creates a present enforceable and binding right over which the promisor has no control without the consent of the promisee, while the latter operates prospectively, and not in praesenti, and is wholly ambulatory and subject to change at the testator's wish, until his death." *In re Lewis' Estate*, 2 Wn. 2d 458, 469, 98 P.2d 654 (1940). "[I]f the obligation prescribed by an instrument in the form of a written contract is revocable and the vesting of an interest or title thereunder is postponed until the death of the obligor, the instrument is testamentary in character and ineffective unless executed in the manner prescribed by statute for the execution of wills. On the other hand, a contract does not take on a testamentary character merely because its performance is postponed until after the death of the maker and devolves upon his representatives." *Duemer* v. *Duemer*, 86 Ohio App. 192, 202–203, 88 N.E.2d 603 (1949); see also *Connecticut Mutual Life Ins. Co.* v. *Burroughs*, 34 Conn. 305, 315 (1867) (life insurance policy was not testamentary instrument because it was contractual in nature and irrevocable); *In re Lundgren's Estate*, supra, 250 Iowa 1237 ("[A]n otherwise valid contract is not rendered testamentary by the fact it provides title to the property is to pass, or payment is to be made, at the maker's death. Such an instrument may be enforced as a contract according to its terms."); *Mertens* v. *Mertens*, 314 Mich. 651, 658, 23 N.W.2d 114 (1946) ("a testamentary

instrument is by its nature revocable"); *Chas. J. Smith Co.* v. *Anderson*, 84 N.J. Eq. 681, 686, 95 A. 358 (1915) ("[I]t cannot be logically reasoned that a contract to convey after death is obnoxious to, and in contravention of, our statute of wills. The covenant is in no sense testamentary. It is contractual and irrevocable, and not benefactory and ambulatory, which are distinguishing features of wills."); *In re Tunnell's Estate*, 325 Pa. 554, 560, 190 A. 906 (1937) ("[a] testamentary provision is ambulatory and may be revoked or changed by later testamentary provision"); *In re Estate of Silverman*, 579 S.W.3d 732, 736 (Tex. App. 2019) (written instrument "must be revocable during the maker's lifetime" to be testamentary in nature). The 99 year lease at issue here is neither ambulatory nor revocable by the owner-lessor. In light of the foregoing, we conclude that the 99 year lease is contractual, rather than testamentary, in nature.

Our determination that the 99 year lease is contractual, rather than testamentary, in nature is largely dispositive of the defendants' claim that an owner-lessor lacks legal authority to enter into a lease for real property whose term commences upon the owner-lessor's death. As one noted treatise observes, "[t]here are many examples, too numerous to cite, of contracts providing for performance at the death of one of the parties, or for the termination of performance at the other party's death, that have been upheld as valid contracts as distinguished from wills. A few examples [are] a contract for the sale of property on the death of the owner, or for the devise of property . . . ." 1 W. Bowe & D. Parker, supra, p. 292; see, e.g., *In re Lundgren's Estate*, supra, 250 Iowa 1236–39 (bilateral contract executed during testator's life to convey deed to real property was valid and was not part of testator's estate because "the contract is an absolute one to be performed at [her] death [and] is not ambulatory in character"); *Reece* v. *Reece*,

239 Md. 649, 661, 212 A.2d 468 (1965) ("a promise in a contractual instrument fixing the time for performance at or after death ordinarily will not impair the instrument's validity as a contract"); *In re Rundberg's Will*, 177 Misc. 43, 44, 29 N.Y.S.2d 375 (1941) ("It makes no difference in such circumstances that part of the reward [under the contract] is payable after death. The character of the promise is not changed by the time fixed for its performance." (Internal quotation marks omitted.)); *In re Herr's Estate*, 400 Pa. 90, 97, 161 A.2d 32 (1960) (written instrument that provided for devise of real property to nephew "upon the decease" of his aunt constituted valid contract, and property was not part of aunt's estate); *In re Murphy's Estate*, supra, 191 Wn. 188–99 (lease agreement providing that leased premises would become property of lessee at time of owner-lessor's death if lessee complied with lease obligations was valid contract and not testamentary disposition); *Harris* v. *Harris*, 130 W. Va. 100, 102, 43 S.E.2d 225 (1947) (contract entered into at time of marital dissolution providing that all of decedent's "property . . . shall be divided equally between [former wife] and their two children" at time of his death was not "a testamentary disposition of property" and precluded widow's claim to "dower in [his] real estate"). The defendants have provided this court with no authority to the contrary.[11]

[11] In their principal appellate brief, the defendants rely on *Wooden* v. *Perez*, 210 Conn. App. 303, 309, 269 A.3d 953 (2022), and *Silverstein* v. *Laschever*, 113 Conn. App. 404, 410, 970 A.2d 123 (2009), which both cite various cases for the unremarkable proposition that title to real estate immediately passes to heirs on the death of an owner of real property. *Wooden* and *Silverstein* are inapposite to the present case, as neither concerned the validity or efficacy of a contractual instrument executed prior to the death of the property owner. The issue in *Wooden* was whether an administrator of an estate lacked standing to pursue an adverse possession action on behalf of the estate with respect to property for which the estate had no interest due to an express devise in the decedent's will. See *Wooden* v. *Perez*, supra, 305–307. *Silverstein* involved the question of whether the Probate Court lacked authority in 2005 to order mortgages to be placed on property for

Moreover, it is well established that life estates in real property may be established by contractual agreement.[12] See *Spooner* v. *Phillips*, 62 Conn. 62, 70, 24 A. 524 (1892) ("[l]ife estates are more frequently created by will . . . and sometimes by contract"); *Irish Bend Farm, LLP* v. *Pinney*, Docket No. CV-11-4015325-S, 2011 WL 6945660, *5 (Conn. Super. November 17, 2011) ("a life estate may be established by written contract"); *In re Estate of Aryeh*, 190 N.E.3d 886, 899 (Ill. App. 2021) ("the parties executed a contract that created a life estate in one of the parties"); *Boulls* v. *Boulls*, 22 P.2d 465, 468 (Kan. 1933) ("[t]he contract evidenced an intention of the husband that the widow should have at his death a life estate of all the property possessed by him"); *Strasburg* v. *Clark*, 319 Md. 583, 591, 573 A.2d 1339 (1990) ("there was in effect between [the husband] and [the wife] at the time of [the wife's] death a contract which provided for a life estate for [the husband] in the [r]esidence"); *Swayne* v. *Lone Acre Oil Co.*, 98 Tex. 597, 606, 86 S.W. 740 (1905) ("[a]t common law there were two classes of life estates: [f]irst, conventional life estates, or those which were created by contract; and, second, those which came into existence by operation of law"). We perceive little meaningful distinction between an owner of real property contractually agreeing to provide a life estate in the property that commences upon the owner's death and an owner of real property contractually agreeing to a lease of the property that commences upon the owner's death. In both instances, the owner has utilized a nontestamentary instrument to circumscribe the testamentary beneficiary's interest in the property for a limited period of time.

which it had ordered a final distribution in 1994 following the decedent's death. See *Silverstein* v. *Laschever*, supra, 417.

[12] "A life estate is an interest in real property, the duration of which is limited by the life of some person. Such person may be the party creating the estate, the tenant himself, or some other person or persons." (Internal quotation marks omitted.) *Smith* v. *Planning & Zoning Board*, 3 Conn. App. 550, 553, 490 A.2d 539 (1985), aff'd, 203 Conn. 317, 524 A.2d 1128 (1987).

Because the 99 year lease is not testamentary in nature, it functions more as a will substitute than a testamentary instrument. See, e.g., *In re Verbeek's Estate*, 2 Wn. App. 144, 153, 467 P.2d 178 (1970) ("In a sense the [real estate] contract was a substitute for a will. However, an instrument may be a will substitute and still not be testamentary."). As this court has explained, "[a] will is a unique kind of transfer, with special rules associated with the proper execution and administration thereof." *Bezzini* v. *Dept. of Social Services*, 49 Conn. App. 432, 442, 715 A.2d 791 (1998). Wills become effective after the death of the testator. See *Sigal* v. *Hartford National Bank & Trust Co.*, 119 Conn. 570, 575, 177 A. 742 (1935); see also *Jacobs* v. *Button*, 79 Conn. 360, 362, 65 A. 150 (1906) ("[a] will is the legal declaration of intention as to the disposition of one's property after death"). At the same time, "Connecticut courts have long held that valuable interests which transfer upon the death of another can be executed in instruments other than wills. The classic example is that of a partnership contract providing for the passing of a partner's share to his spouse upon his death. . . . Such a transfer is considered 'nonprobate' because the interest transferred upon the transferor's death is not considered to be a part of the estate for the purposes of probate. Multiple types of nonprobate transfers exist, and are collectively referred to as 'will substitutes.' " (Citations omitted.) *Eberle* v. *Ohlheiser*, Superior Court, judicial district of Hartford, Docket No. CV-12-6029172 (September 27, 2012) (54 Conn. L. Rptr. 852, 855); see also *Bezzini* v. *Dept. of Social Services*, supra, 442–43 (revokable trust is "a will substitute" that is not testamentary in nature).

The Restatement (Third) of Property defines a will substitute as "an arrangement respecting property or contract rights that is established during the donor's

life, under which (1) the right to possession or enjoyment of the property or to a contractual payment shifts outside of probate to the donee at the donor's death; and (2) substantial lifetime rights of dominion, control, possession, or enjoyment are retained by the donor." 2 Restatement (Third), Property, Wills and Other Donative Transfers § 7.1 (a), p. 69 (2001). The 99 year lease here meets that definition. Moreover, the Restatement recognizes that "[a]n arrangement respecting either property or contract rights can be used as a will substitute." Id., comment (a), p. 71. As it explains, a will substitute is not tantamount to a will because "[a] will transfers ownership of probate property at death. . . . Property subject to a will substitute is not probate property at death because it is then treated as no longer owned by the donor. . . . [A] will substitute transfers ownership during life—it effects a *present* transfer of a *nonpossessory future* interest or contract right, the time of possession or enjoyment being postponed until the donor's death. . . . [A] contract right can be conferred on another even though the contract right is a right to possession or enjoyment of money or other property some time in the future and is subject to a power or other conditions that might not be permanently resolved until the contract right becomes enforceable." (Citations omitted; emphasis in original.) Id., p. 70.

Although George also executed a valid will, that fact has little bearing on whether the 99 year lease operates as a will substitute. As the Appellate Court of Illinois aptly observed, "[a] will and a will substitute may coexist." *Handelsman* v. *Handelsman*, 366 Ill. App. 3d 1122, 1130, 852 N.E.2d 862 (2006). In that case, the plaintiff argued that the agreement in question was "not a 'will substitute,' because [the decedent] executed a valid will." Id. The court rejected that contention, noting that the agreement satisfied the definition of a will substitute

set forth in § 7.1 of the Restatement (Third) of Property "whether or not [he] also executed a will." Id. The court further opined that "to hold that the existence of [the] will means that the [agreement] is not a will substitute would exalt form over substance." Id. We concur with that assessment.

To be sure, George incorporated the 99 year lease by reference in his will. Neither party challenges the propriety thereof in this appeal. See, e.g., *Waterbury National Bank* v. *Waterbury National Bank*, 162 Conn. 129, 139, 291 A.2d 737 (1972) (will incorporated irrevocable trust agreement by reference); *Hechtman* v. *Savitsky*, 62 Conn. App. 654, 661–62, 772 A.2d 673 (2001) (will incorporated antenuptial agreement by reference); *Batterton* v. *United States*, 406 F.2d 247, 249–50 (5th Cir. 1968) (noting "the overwhelming majority rule in the United States that, under proper circumstances a will may incorporate clearly identified existing writings as a part of [a] will"), cert. denied, 395 U.S. 934, 89 S. Ct. 1995, 23 L. Ed. 2d 448 (1969); 1 Restatement (Third), Property, Wills and Other Donative Transfers § 3.6, p. 234 (1998) ("[a] writing that is not valid as a will but is in existence when a will is executed may be incorporated by reference into the will if the will manifests an intent to incorporate the writing and the writing to be incorporated is identified with reasonable certainty"). The fact that the 99 year lease is incorporated by reference into George's will demonstrates that it was executed *prior* to the execution of that will, a distinction noted by the court in its memorandum of decision denying the defendants' motion for summary judgment. See 1 Restatement (Third), supra, § 3.6, comment (b), p. 235 ("[i]f the will refers to a writing as existing when the will was executed, a writing that fits the will's description but is undated is presumed to have been in existence when the will was executed"); see also *In re Ruth Easton Fund*, 680 N.W.2d 541, 547–48 (Minn.

App. 2004) (concluding, in case involving written agreement that was incorporated by reference into will, that "the agreement is presumed to have been in existence when the will was executed" because they "were executed on the same day"). Indeed, the will here states that the 99 year lease "has already been signed" and "has been executed by [George] and [the plaintiffs]."

Incorporating a written agreement into a will serves to memorialize the existence of nontestamentary instruments and aids in ascertaining the testator's intent. See *Waterbury National Bank* v. *Waterbury National Bank*, supra, 162 Conn. 139–41; *Hechtman* v. *Savitsky*, supra, 62 Conn. App. 662; 1 Restatement (Third), supra, § 3.6, comment (h), p. 236. At the same time, the validity and efficacy of such nontestamentary instruments is unaltered by their incorporation into a valid will. The 99 year lease was executed in 2016 and became operative irrespective of whether George prepared a will or died intestate. The contractual rights memorialized therein—including the right to sublease the premises at any time and to mortgage the leasehold interest—passed to the plaintiffs by virtue of that irrevocable nontestamentary instrument, not George's will. For that reason, the bequest of the "entire" property to the defendants in article VI, § 2, of the will would be subject to the 99 year lease *even if* the will contained no reference to that lease.

Lastly, to the extent that any question exists as to the proper interpretation of the bequest of the property to the defendants, we note that there is no dispute as to the testator's intent. As the court found in its memorandum of decision, George intended to make his devise of the entire property to the defendants subject to the 99 year lease. The defendants do not argue otherwise in this appeal. Rather, they submit that it is inherently inequitable to permit George to bind them as property owners to a lease for which they had no opportunity

to agree. Yet the same could be said of the food stand lease, which too was executed prior to George's death and binds the defendants as successor lessors until April 22, 2050. Moreover, that contention rings hollow in light the defendants' concession at oral argument that, had the term of the 99 year lease commenced *prior* to George's death, they would not be maintaining the present appeal. The scope of the bequest to the defendants remained at all times the prerogative of George, who plainly intended to subject that gift to the 99 year lease. As with any other inherited property, such as silver or china; see *Burnham* v. *Hayford*, 141 Conn. 96, 98, 104 A.2d 217 (1954); the defendants remain free to dispose of the property in the future.

In sum, we conclude that the 99 year lease is contractual, rather than testamentary, in nature and conferred rights in the plaintiffs prior to the death of the owner-lessor. For that reason, the court properly concluded that the 99 year lease was valid despite the fact that its lease term commenced upon George's death.

The judgment is affirmed.

In this opinion the other judges concurred.